**DALLAS COUNTY SCHOOLS,**
Appellant

v.

**Paul GREEN, Appellee**
**No. 05–14–00432–CV**

Court of Appeals of Texas,
Dallas.

Opinion Filed January 19, 2016

Rehearing Overruled February 10, 2016

---

8. *Id.*

Bruce K. Thomas, Javier Perez, Matthew R. Scott, Dallas, TX, for appellees.

Christine Roseveare, P. Michael Jung, Dallas, TX, for appellants.

Before Justices Fillmore, Myers, and Whitehill

## MEMORANDUM OPINION

Opinion by Justice Whitehill

The decisive question in this disability discrimination case under the Texas Commission of Human Rights Act (the "TCHRA") is whether there is legally sufficient evidence that an employee's disability was a motivating factor in his employer's decision to terminate his employment.

Paul Green had a congestive heart failure condition during the time Dallas County Schools ("DCS") employed him as a bus monitor. His employment was terminated after an episode of incontinence while he was on his assigned school bus. He thereafter sued DCS under the TCHRA, claiming that he was disabled and that his disability was (or its related effects were) a motivating factor in DCS's decision to fire him.

The case was tried to a jury. In that trial, Green argued that DCS terminated his employment because of his disability and the side effects of the medication he took for that disability.[1] DCS denied Green's claim, and argued that his disability and medication did not cause his incontinence. DCS further argued that it had legitimate, non-discriminatory reasons for terminating Green's employment. The jury found for Green and awarded him $166,292.

On appeal, DCS argues that the evidence is legally and factually insufficient to support the jury's finding that Green's disability was a motivating factor in DCS's decision to terminate his employment because the evidence does not support a finding that (i) the decision maker knew of the disability, or (ii) Green's disability or the medication he was taking for it caused his incontinence. DCS further argues that the evidence is legally or factually insufficient to support the jury's finding that DCS would not have made the same decision to terminate Green's employment if it had not considered his disability. Finally, DCS challenges the attorney's fees award.

For the reasons discussed below, we conclude that the evidence was legally insufficient to establish that Green's disability or his related medication for it was a factor in the event that precipitated Green's termination. Thus, it necessarily follows that neither was a motivating factor in the termination decision. We therefore reverse the trial court's judgment and render judgment for appellant Dallas County Schools.

## I. Background

DCS in 2009 hired Green to work as a bus monitor. The bus transported special needs children, and Green was responsible for their care and safety regarding the bus. His duties included things like strapping in wheelchairs, adjusting tubes, and helping students with their seatbelts and backpacks. When he was hired, Green told his supervisor, Yvonne Stuart, about

---

1. Although Green suffered from other medical conditions, including hypertension and colon cancer, the disability at issue here is congestive heart failure. Coreg was the medication Green was then taking for its treatment.

his medical conditions and that he took the drug Lasix. Lasix is a diuretic.

Before the incident in question, Green received two disciplinary referrals, neither of which involved incontinence. The first event resulted in an oral warning, and the second resulted in a four-day suspension.

On August 22, 2011, Green transferred from Irving to DCS's Lawnview Service Center, where he reported to Rhonda Davis. On August 30, Green was assigned to monitor a bus driven by Carlos Barcena.

On that day, after dropping the sole student on the bus at his destination, Green told Barcena that he needed to use the restroom and asked Barcena to stop at a gas station. Barcena initially said that he would, but he then instead turned into a residential area rather than toward the gas station.

Green thereafter urgently repeated his request, and begged Barcena to stop. In response, Barcena asked Green to wait until the next scheduled stop.

Green, however, was unable to control his bladder and involuntarily urinated in his pants. Green then asked Barcena to stop again. When Barcena complied, Green concealed himself behind the bus doors and used an empty water bottle to finish urinating.

Although the front of Green's pants was wet, Green did not get urine on the seat, and no part of the bus needed cleaning. Green did not wash his hands or clean himself.

When the bus reached the next scheduled stop, a student in a wheelchair boarded the bus. Green secured the wheelchair with straps, but did not touch the child. When the bus reached its destination, Green released the wheelchair straps.

Barcena reported the incident to Davis, and Davis notified the area director, Dennis Johnson. Green and Barcena were asked to prepare written accounts of the incident. Their statements were then given to Johnson.

Green and Johnson later met on September 16, and Johnson terminated Green's employment. Green was given a letter stating that his employment was being terminated because he "failed to protect the health and safety of the students boarding at [his] next scheduled stop from exposure to bodily fluids, by continuing to perform [his] functions as a bus monitor after the incident."

Barcena, however, was suspended for one day without pay, and although he was required to complete additional training, he never completed it.

Green appealed his termination through DCS's grievance process, and the termination was upheld at each level. Green then began this lawsuit, claiming that DCS terminated his employment because he was disabled.

At trial, three medical experts testified about congestive heart failure, the drug Coreg, and urinary incontinence. The jury also heard considerable testimony about the termination process and the reasons for DCS's decision. And there was testimony that prior to the incident at issue here, when Green needed to urinate, the bus drivers would take him to a public restroom and tell DCS dispatch about the unscheduled stop. No driver was ever disciplined for this.

Green maintained that he was fired for urinating on himself. DCS, however, said that it terminated Green's employment because he failed to protect the students' health and safety.

When the evidence concluded, the jury was instructed, without objection, that:

Plaintiff Paul Green claims he was discriminated against because of his disability.

Specifically, Mr. Green claims Defendant Dallas County Schools terminated his employment because of his disabilities, the side effects of his disabilities, and/or the side effects of the medications he takes to treat his disabilities.

Defendant Dallas County Schools denies Mr. Green's claims, and contends that Mr. Green's disabilities did not cause him to urinate on the school bus and, regardless, Dallas County Schools had legitimate non-discriminatory reasons for its decisions and actions. Dallas County Schools maintains that Mr. Green's acts and omissions after urinating on the school bus warranted the termination of his employment.

It is unlawful to terminate the employment of a qualified individual with a disability because of the individual's disability.

To succeed in this case, Mr. Green must prove the following three items by a preponderance or the evidence:

    a.  Mr. Green had a disability;

    b.  Mr. Green was qualified for the job he held; and

    c.  Mr. Green's disability was a motivating factor in Dallas County Schools' decision to terminate Mr. Green's employment.

A "motivating factor" in an employment decision is a reason for making the decision at the time it was made. There may be more than one motivating factor for an employment decision.

Mr. Green does not have to prove that his disability was the only reason Dallas County Schools terminated his employment.

If you believe the reason(s) Dallas County Schools has given for its decision, you may, but are not required to, infer that Dallas County Schools did not terminate Mr. Green's employment because of his disabilities. At the same time, if you disbelieve the reason(s) Dallas County Schools has given for its decision, you may, but are not required to, infer Dallas County Schools terminated Mr. Green's employment because of his disability.

Simply because Mr. Green is a qualified individual with a disability, however, does not automatically mean that his disability caused Mr. Green to urinate on himself, nor does it automatically mean that Dallas County Schools terminated Mr. Green's employment because of his disability. Those issues are what you must decide based on the law that I have given you and the facts that have been presented to you during this trial.[2]

Following these instructions, the jury was asked (i) whether Green's disability was a motivating factor in DCS's decision to terminate Green's employment; (ii) whether DCS proved that it would have made the same decision to terminate Green's employment even if it had not considered his disability or disabilities; and, conditioned on affirmative liability finding, (iii) whether Green suffered any damages.

The jury answered "yes" to question one, "no" to question two, and awarded Green $41, 292.00 for back pay and $125,000 for "compensatory damages in the past." The trial court subsequently awarded $333,750 for attorney's fees and $5,800 for expert fees, and entered a final

---

**2.** We offer no opinion on whether the charge was proper. Instead, because there was no objection to the charge, we measure the suffi- ciency of the evidence against the charge that was given. *See Osterberg v. Peca,* 12 S.W.3d 31, 55 (Tex. 2000).

judgment awarding Green damages, fees, expenses and pre-judgment interest for $522, 184.25. DCS appeals from that final judgment.

## II. Analysis

### A. Standard of Review

DCS challenges the legal and factual sufficiency of the evidence to support the jury's finding that Green's disability was a motivating factor in DCS's decision to terminate Green's employment, an issue on which DCS did not have the burden of proof. Thus, DCS must demonstrate that there is legally no (or factually insufficient) evidence to support the finding. *See Long v. Long*, 196 S.W.3d 460, 464 (Tex.App.—Dallas 2006, no pet.).

In our legal sufficiency review, we view the evidence in the light most favorable to the verdict, crediting favorable evidence if a reasonable factfinder could, and disregarding contrary evidence unless a reasonable factfinder could not.[3] *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005). Although we disregard all evidence contrary to the finding in question, we need not disregard undisputed evidence that allows only one logical inference. *Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 51 n.1 (Tex. 1997). We sustain a no evidence issue only if there is no more than a mere scintilla of evidence proving an element of the claim. *See St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 520 (Tex. 2002). Evidence does not exceed a scintilla if it is "so weak as to do no more than create a mere surmise or suspicion" that the fact exists. *Kroger Tex. Ltd. Partnership v. Suberu*, 216 S.W.3d 788, 794 (Tex. 2006).

### B. Disability under the TCHRA

The TCHRA provides for the execution of policies embodied in the Americans with Disabilities Act. *See* TEX. LAB. CODE ANN. § 21.001(3) (West 2015).[4]

■ To establish a prima facie case of disability discrimination under the TCHRA, a plaintiff must show (1) he has a disability, (2) he is qualified for the job, and (3) he suffered an adverse employment decision "because of his disability." *See Davis v. City of Grapevine*, 188 S.W.3d 748, 757 (Tex.App.—Fort Worth 2006, pet. denied); *Tex. Dept. of Fam. & Protective Svcs. v. Howard*, 429 S.W.3d 782, 786 (Tex.App.—Dallas 2014, pet. denied).

A "disability" is a(i) physical or mental impairment that substantially limits at least one major life activity of that individual, (ii) a record of such impairment, or (iii) being regarded as having such an impairment. TEX. LAB. CODE ANN. § 21.002(6) (West 2015); *Thomann v. Lakes Regional MHMR Ctr.*, 162 S.W.3d 788, 796 (Tex. App.—Dallas 2005, no pet.).

Here, however, the jury was not tasked with determining the first two elements of disability discrimination. Instead, they were instructed that Green was a qualified individual with a disability. Thus, the jury was only required to determine whether Green's disability was a motivating factor in DCS's decision to terminate his employment.

### C. Was there any evidence that Green's disability, or the medication he was taking for that disability, caused Green's incontinence episode on the bus?

#### 1. Introduction

---

**3.** Given our disposition, we discuss only the legal sufficiency standards.

**4.** Accordingly, we are often guided by federal law in construing chapter 21. *See Haggar Apparel Co. v. Leal*, 154 S.W.3d 98, 100 (Tex. 2004).

■ Both parties agree that DCS terminated Green's employment because of what happened on the bus. According to Green, he was fired because of his incontinence episode, which he urges that his congestive heart failure medicine (Coreg) caused. Conversely, DCS says that it fired Green because of what he failed to do after that episode. Either way, Green's incontinence was a necessary link in the chain of events.

Green asserts that it is irrelevant whether Coreg or other factors caused his incontinence because the TCHRA does not require that the cause of a disability be proved with medical certainty. According to Green, he was only required to prove that he was disabled, which fact he proved as a matter of law. We disagree with Green's characterization.

Although the jury was instructed that Green was disabled, the reason for Green's incontinence does not go to the disability prong. Rather, in this case, the reason for his incontinence is relevant to whether his disability (congestive heart failure) was a motivating factor in his termination. For the jury to have found that DCS terminated Green's employment because of his congestive heart failure, there had to be some evidence linking that disability to the incontinent episode on the bus. The only explanation Green offered to link his disability to the incident was that his Coreg medication allegedly caused his incontinence. We therefore examine the evidence to determine if there was legally any evidence that Green's congestive heart failure, or the Coreg he took for it, caused the incontinent episode that led to his firing.

As discussed below, Green did not offer more than a scintilla of evidence that his congestive heart failure or his Coreg caused his incontinent event, and DCS provided conclusive evidence to the contrary.

## 2. The Evidence

### Green

Green testified that he was diagnosed with congestive heart failure in 1998, and colon cancer in 2001. He began working for DCS as a bus monitor in 2009.

Although Green previously took Lasix, a diuretic, for his congestive heart failure, he was taking Coreg for that condition when the incontinent event occurred. Thus, when he was fired, Green told his supervisor, Mr. Johnson, that he had a medical condition that caused the incident and that he was taking a "fluid pill." He called Coreg a diuretic because he previously took Lasix and thought Coreg would "do the same thing."

From the time he began treatment for congestive heart failure, he "always had the occasional need to urinate frequently." Green also stated, however, that the incident on the bus was the first time he felt an immediate need to urinate. He described the condition causing this immediate need as "nature." On prior occasions, when he needed to urinate, the other bus drivers would stop at a public restroom.

### Dr. Feagins

Green's expert, Dr. Brian Feagins, is board certified in urology. For the past ten of his twenty years in practice, he has focused on incontinence and voiding dysfunction issues.

Dr. Feagins opined that grown men do not typically desire to urinate on themselves. But he "would not think" that congestive heart failure would lead to incontinence issues.

Furthermore, a patient with congestive heart failure would not put Dr. Feagins on notice that the patient might have idio-

pathic over activity of the bladder. If he had never looked at a patient's chart, and the patient had congestive heart failure and complained about an overactive bladder, it would "cross his mind" that "possibly" the patient was on a diuretic. But he did not see anything in Green's chart to indicate that he was taking a diuretic.

Dr. Feagins was asked about Coreg, the medicine Green was taking for his congestive heart failure. He said that Coreg is not a diuretic in and of itself, "but it is certainly possible the drug can cause increased frequency and perhaps increased urgency [of urination] in a patient."

When he was asked to elaborate on how Coreg could cause frequent urination, Dr. Feagins explained that Coreg is a beta blocker that could block the receptors which normally tell the bladder to relax. Specifically, he said:

> [W]e know that in the bladder, there are receptors that when the central nervous system stimulates those, the bladder would relax ... So if you give the beta blocker, then what you **may** have is a blockage of those normal—those receptors which would normally tell the bladder to relax. And therefore, the bladder is gonna be ... more active.

(emphasis added).

Dr. Feagins further explained that the one question is always how much of a beta block there is for the bladder when taking Coreg, and "[t]hat's something that ... a pharmacologist would have to answer, but it certainly is a *theoretical* reason for that causing the issue of bladder over activity." (Emphasis added).

In terms of whether Coreg could have caused Green's incontinence episode, Dr. Feagins said that he "would *guess* it was a contributing factor, *possibly*, but I don't know I would say it was absolutely the

source of the—or the cause of it, no." (emphasis added).

Dr. Feagins also explained that the reference in the Coreg package insert to "microurition frequency" means that the medication could cause increased urinary frequency. Urinary frequency, however, is not the same as loss of bladder control. Nonetheless, urinary frequency and urinary urgency "frequently go hand-in-hand."

When asked whether he had an opinion about why Green suffered an incontinent episode, Dr. Feagins offered that since Green had been recently treated for a bladder infection, he "might have had another one." Green also might have had an overactive bladder from an enlarged prostate, but there was no indication in his records that this was the case. Dr. Feagins also said that while "it is a possibility" that Coreg could have caused some issues with increased over activity of the bladder, he could not "say for certain what caused the incontinence."

### Dr. Strader

Dr. James Strader, a cardiologist, testified as DCS's expert about whether Coreg causes urinary incontinence or loss of bladder function.

Dr. Strader is familiar with and has prescribed Coreg, a common medication used to treat congestive heart failure and hypertension. He has received specific training on using Coreg to manage patients with heart failure. That training required him to review the clinical trial data on Coreg.

Furthermore, he has never had a patient complain about loss of bladder control or incontinence while on Coreg. In nine years, having prescribed Coreg thousands of times, he has never seen an instance where Coreg caused loss of bladder con-

trol. He has also never seen or heard of a report that Coreg has an effect on bladder function. In fact, it is his understanding that Coreg has no effect on the bladder.

When he was asked whether having congestive heart failure would equate to having the need to immediately urinate, Dr. Strader replied, "No. In fact, it's just the opposite. People who are in congestive heart failure typically urinate less...."

Additionally, he said that a diuretic is medicine that induces urination, and Coreg is not a diuretic. Strader is "as medically certain as [he] can be" that Coreg does not cause a loss of bladder control.

According to Dr. Strader, Green's medical records show that Green was briefly on a Lasix, a diuretic, in the 2006/2007 time frame, but there is nothing in his records demonstrating that he took Lasix after that time.

Dr. Strader also reviewed the Coreg package insert. He clarified that the clinical trial information does not show loss of bladder control as a Coreg side effect. He explained the distinction between loss of bladder control and urinary frequency. Loss of bladder control is the inability to control when and where one urinates; whereas, urinary frequency is a need to urinate more often.

### Dr. Xavier

Dr. Keith Xavier, a urologist specializing in pelvic medicine and incontinence, also testified as a DCS expert. Like Dr. Strader, he noted that urinary incontinence differs from urinary frequency.

Dr. Xavier did not see anything in Green's medical records to indicate that Green had issues with incontinence, urinary frequency, or any other bladder issue. In addition, there was nothing in Green's records showing that he had a urinary tract infection that would have caused an incontinent episode when the incident occurred in August 2011. Likewise, the records do not show any obstruction of the bladder or prostate issues. Green's records do not indicate that he was on a diuretic at that time. And it is "highly unlikely" that Coreg would cause Green's need to urinate while on the bus.

Dr. Xavier is familiar with the drug Coreg, and explained that it is not a chemical diuretic and does not act like one. Coreg is a beta blocker that works on the cardiovascular system, whereas a chemical diuretic works on the kidneys.

Urinary incontinence is not listed in the package insert among Coreg's side effects. And the insert refers only to urinary frequency in about .1 to 1 percent of patients.

Furthermore, according to Dr. Xavier, although incontinence is mentioned as part of Coreg's post-market studies, these studies are based on actual patient reports after the drug has been approved. Because these patients are not participants in controlled medical studies, it is impossible to determine with any certainty whether the incontinence was caused by Coreg or some other medical issue. There is no definitive information linking Coreg to incontinence.

Dr. Xavier would not expect a lay person to make any kind of connection between Coreg and incontinence. And congestive heart failure is not an indication that someone might have a urinary incontinence issue. In fact, there is "really no relationship between congestive heart failure and urinary incontinence."

On cross-examination, Dr. Xavier allowed that while it is highly unlikely that Coreg led to Green's incontinence, it is not impossible.

### 3. Causation.

Green insists that the cause of a disability need not be established to a reasonable medical probability. But the cause of the disability is not at issue here. Instead, the question is whether the disability or the medicine taken for that disability caused the event (Green's incontinence) that precipitated Green's termination. In other words, was there a causal connection between the disability and his termination. That is, assuming we were to accept Green's premise that DCS terminated Green because he experienced incontinence while he was on the bus, there still must be some evidence that the disability caused the incontinence.

All of the medical experts agreed that Green's congestive heart failure itself did not cause Green's incontinence. The experts also noted that Green was no longer taking a diuretic, but instead was taking Coreg. As Dr. Xavier explained without contest, Coreg is not a diuretic and does not act like one.

There was no disagreement that loss of bladder control and urinary frequency differ. And there was nothing in the medical records, nor was there any medical testimony, that Green regularly experienced or had any medical condition that would cause either one.

Green's own expert, Dr. Feagins, did not opine that Coreg causes loss of bladder control, nor did he affirmatively conclude that Coreg caused Green's incontinence. Instead, he speculated that it was *possible* that Coreg might have caused some issues with bladder *over activity*. As the doctor noted, his explanation of how a beta blocker like Coreg might cause bladder over activity was purely theoretical. He could not, and did not, say that Coreg caused or contributed to Green's incontinent episode.

■ Conclusory or speculative opinion testimony like what Dr. Feagins gave is legally no evidence because it does not tend to make the existence of material facts more or less probable. *See Jelinek v. Casas*, 328 S.W.3d 526, 536 (Tex. 2010) (*citing Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 637 (Tex. 2009)); *Coastal Transp. Co. Inc. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 233 (Tex. 2004). When an expert offers a conclusory opinion, it must be supported by an explanation with a sound evidentiary basis or the opinion is legally no evidence. *Jelinek*, 328 S.W.3d at 536.

Dr. Feagins offered other possible reasons for Green's incontinence episode. But again, he was speculating about generalized possibilities, and he offered no evidence excluding any of the other potential causes with any certainty. *See generally, E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 559 (Tex. 1995) (finding that expert's failure to rule out other causes rendered his opinion little more than speculation).

The undisputed evidence thus allows only one result—there was legally no evidence establishing a relationship between the fact that Green took Coreg for his congestive heart failure and his incontinence episode on the bus. Because there was legally no evidence linking the incontinence to Green's disability, even if the jury believed that DCS terminated Green because of his incontinence while on the bus, they could not reasonably conclude that Green's congestive heart failure or the medication he was taking for that disability was a motivating factor in DCS's decision to terminate Green. *See Wal–Mart Stores, Inc. v. Canchola*, 121 S.W.3d 735, 740 (Tex. 2003) (no evidence supported jury's finding that plaintiff was terminated because of heart condition).

Nonetheless, Green relies heavily on the charge instruction that, "if you disbelieve the reason(s) Dallas County Schools has

given for its decision, you may, but are not required to, infer Dallas County Schools terminated Mr. Green's employment because of his disability" and the jury's finding that Green's disability was a motivating factor in its decision to terminate his employment as satisfying Green's burden to prove that his disability was in fact a motivating factor in its decision to fire him. The flaw in Green's argument, however, is that it implicitly assumes that Green's disability—or, more specifically his congestive heart failure medicine—was a factor in the incontinence episode that led to his firing when there is legally no such evidence supporting that necessary connection.

For the above reasons, we sustain the second part of DCS's first issue.

### 4. "Regarded As" Disabled.

 At oral argument and in post-submission briefs, Green argued for the first time that because the statutory definition of "disability" includes either an actual disability or that DCS regarded Green as disabled, the jury could decide that DCS discriminated against Green based on either part of the definition. This alternative "regarded as" theory, however, was not (i) pled,[5] (ii) submitted as part of the unobjected-to jury charge, or (iii) mentioned in closing argument. And this new alternative theory of "regarded as" disability is by definition inconsistent with the actually pled and tried claim that Green was, in fact, disabled.

 The statute provides three disjunctive alternatives to meet the definition of "disability," which include an actual disability or being regarded as disabled. See Tex. Lab. Code Ann. § 21.002(6). Thus, based on unambiguous statutory text, "regarded as" disabled is an entirely different theory of disability based on the

premise that the claimant is not in fact disabled, but that his employer regards him as being disabled. Stated differently, this disability discrimination theory applies to individuals who do not have any of the impairments defined in the statute but are treated as having a substantially limiting impairment. See Columbia Med. Ctr. v. Szurek, 101 S.W.3d 161, 167 (Tex. App.—Fort Worth 2003, pet. denied).

As discussed above, Green's "regarded as" disabled theory is inconsistent with his claim that he was in fact disabled as pled and submitted to the jury in the unobjected-to charge. And our review must be based on the charge that was actually given. See Osterberg, 12 S.W.3d at 55.

Here, the jury was instructed that Green had an actual disability; there was no alternative for finding that Green was not disabled but that DCS otherwise regarded him as having a non-existent disability and terminated him for that reason. Accordingly, we reject Green's "regarded as" disability argument.

### III. Conclusion

Because we have concluded that the evidence is legally insufficient to support the jury's finding that Green's disability was a motivating factor in DCS's decision to terminate his employment, we need not reach DCS's remaining issues. See Tex. R. App. P. 47.1.

For the reasons discussed above, we reverse the trial court's judgment and render judgment that Green take nothing on his claims.

---

**5.** Green's sixth amended petition (his live pleading) refers only to an actual disability claim without mentioning a potential "regarded as" disabled claim.