11. USI raises a second issue on appeal, asking whether a trial court's order granting a new trial is reviewable on appeal after the

negligence. And even if all of that were incorrect, USI invited the alleged error and waived its complaint. I would hold that Levine is entitled to recover on the jury's finding that USI negligently caused Levin's injuries.[11] Because the Court does not, I respectfully dissent.

**Paul GREEN, Petitioner,**

v.

**DALLAS COUNTY SCHOOLS,**
**Respondent**

**No. 16-0214**

Supreme Court of Texas.

OPINION DELIVERED: May 12, 2017

Rehearing Dismissed July 21, 2017

new trial. I would proceed to answer that question, which the Court does not reach.

Brian East, Austin for Amicus Curiae AARP, AARP Foundation, American Diabetes Association and Disability Rights Texas.

Matthew Roy Scott, Javier Perez-Afanador, Scott | Perez LLP, Dallas, Bruce K. Thomas, Law Office of Bruce K. Thomas, Dallas, Jamie Jean Walters McKey, Kendall Law Group, Dallas, for Petitioner.

P. Michael Jung, Christine D. Roseveare, Strasburger & Price LLP, Dallas, Laura Christine Rodriguez, Meredith Prykryl Walker, Walsh Gallegos Treviño Russo & Kyle P.C., Irving, for Respondent.

## PER CURIAM

In this disability-discrimination case, the trial court entered judgment on the jury's verdict in favor of the employee. The court of appeals reversed, holding the employee offered no evidence he was terminated "because of" his congestive heart failure. We conclude the court of appeals erred by treating the employee's heart condition as his only disability. The evidence, viewed in light of the jury charge, supports a finding that the employee was terminated because of a different disability: urinary incontinence. We reverse the court of appeals' judgment and remand to that court for further proceedings.

Paul Green worked as a bus monitor for Dallas County Schools (DCS), transporting children with special needs. When first hired, Green told his supervisor he had congestive heart failure and was taking Lasix, a diuretic drug. He later began taking Coreg, a drug he believed had the same urinary side effects. A few years later, DCS assigned Green to a new bus driven by Carlos Barcena.

On August 30, 2011, after the bus dropped off the only student, Green asked Barcena to stop at a gas station so Green could use the bathroom. Barcena agreed but then turned into a residential area instead of towards the gas station. Green repeated his request, ultimately begging Barcena to stop, but Barcena asked him to wait until the next scheduled stop. Green could not wait and involuntarily urinated in his pants. Green again asked Barcena to stop. When Barcena complied, Green concealed himself behind the bus doors and finished urinating into an empty water bottle. Green's pants were wet, but he had not wet the seat or elsewhere on the bus. At the next scheduled stop, Green helped a wheelchair-bound student board the bus, secured the wheelchair's straps, and later released the straps when the bus reached its destination. Green denied that he ever touched the student.

Barcena reported the incident to their supervisor, who notified DCS's area director, Dennis Johnson. Green and Barcena provided written statements about the incident to Johnson. On September 16, Johnson terminated Green's employment. Johnson explained in a termination letter that he fired Green because Green "engaged in unprofessional conduct while on a DCS school bus," admitted to "urinating on [himself] and in a water bottle while onboard the school bus," and "failed to protect the health and safety of the students boarding at [the] next scheduled stop from exposure to bodily fluids." Green unsuccessfully appealed his termination through DCS's grievance process. Green then initiated this lawsuit, alleging DCS terminated his employment because he was disabled.

During a six-day trial, the jury heard testimony about the termination process, the reasons for DCS's decision, congestive heart failure, the drug Green was taking, and urinary incontinence. Green testified that, before his assignment to Barcena's bus, other drivers accommodated his urinary issues by taking him to a public restroom and informing DCS dispatch about the unscheduled stops. DCS never disciplined the other drivers for this conduct. One of those drivers, Reverend Clyde Strickland, testified that Green said he took medication that sometimes caused an urgent need to urinate.

Under the Texas Labor Code, an employer "commits an unlawful employment practice" if it discharges an individual "because of ... disability." TEX. LAB. CODE § 21.051(1). At trial, the parties agreed that, to prevail on his disability-discrimination claim, Green must prove (1) he has a disability, (2) he was qualified for the job, and (3) he suffered an adverse employment decision because of his disability. *See Davis v. City of Grapevine*, 188 S.W.3d 748, 757 (Tex. App.—Fort Worth 2006, pet. denied) (citing *Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1092 (5th Cir. 1996)); *see also* TEX. LAB. CODE § 21.001(3) (codifying the purposes of the Act, including execution of the policies embodied in federal employment discrimination legislation); *City of Hous. v. Proler*, 437 S.W.3d 529, 532 (Tex. 2014) ("In construing Texas law on [employment discrimination], we consider federal civil rights law as well as our own caselaw.").

The parties also agreed—and the trial court instructed the jury—that Green sat-

isfied the first two elements as a matter of law. Thus, the only issue for the jury was whether DCS terminated Green "because of" his disability. On that issue, and without objection, the court asked the jury three questions: (1) whether "Green's disability [was] a motivating factor in [DCS's] decision to terminate [his] employment;" (2) if so, whether DCS proved that it "would have made the same decision to terminate [Green's] employment even if it had not considered his disability or disabilities;" and (3) if not, whether Green suffered any damages. The jury answered "yes" to the first question, "no" to the second question, and awarded Green $41,292 in back pay and $125,000 in compensatory damages. The trial court rendered judgment for Green based on the jury's verdict.

The court of appeals reversed and rendered a take-nothing judgment, concluding there was no evidence that DCS fired Green "because of" his disability. The court reasoned that, even if the evidence established "that DCS terminated Green because he experienced incontinence while he was on the bus, there still must be some evidence that [Green's] disability caused the incontinence." 518 S.W.3d at 454–55, 458, 2016 WL 229434 (Tex. App.—Dallas 2016). In the court's view, Green's only "disability" was congestive heart failure. *Id.* at 451 n.1, 2016 WL 229434 (stating that "the disability at issue here is conges-

tive heart failure"). Based on that belief, the court held even if DCS fired Green because of urinary incontinence, Green could not establish he was terminated "because of" his disability (that is, congestive heart failure) unless he provided evidence that his heart condition or the medication he was taking for it caused the incontinence for which DCS fired him. *Id.* at 455, 2016 WL 229434. Because Green provided no evidence of "the reason for [his] incontinence," the court of appeals concluded Green failed to establish that "his disability (congestive heart failure) was a motivating factor in his termination." *Id.* at 455, 2016 WL 229434.

Green says the court of appeals erred because Green's urinary incontinence was "itself a disability," as well as "a side effect of other disabilities and of Green's medications." According to Green, the court erred in holding that "the disability at issue here is congestive heart failure," *id.* at 451 n.1, 2016 WL 229434, because Green submitted evidence that he "had several disabilities (admitted by DCS) including congestive heart failure *and* urinary incontinence." Because the jury heard evidence that Green suffered from incontinence and that DCS terminated Green because of that disability, Green contends the court of appeals erred by requiring him to also establish that his heart condition caused his incontinence.[1] In response, DCS argues

---

1. In his brief, Green also argues in broader terms that the court of appeals erred by requiring him to prove "the cause of [his] disability" or "why he had a disability." According to Green, the court erred because the law does not require a disability-discrimination plaintiff to prove what caused his disability. *See Navarro v. Pfizer Corp.*, 261 F.3d 90, 97 (1st Cir. 2001) (noting that "the source of an impairment is irrelevant to a determination of whether that impairment constitutes a disability"). We agree with DCS, however, that the court of appeals did not require Green to

prove what caused his disability. Indeed, as DCS notes, the court of appeals expressly explained that "the cause of the disability is not at issue here." 518 S.W.3d at 458. Instead, the court concluded that Green's heart condition was his only possible disability, and then required Green to prove that the heart condition caused the urinary incontinence for which DCS fired him. Because, in the court of appeals' view, Green's urinary incontinence was not itself a disability, Green had to prove his heart condition caused his incontinence, but he did not have to prove what caused his heart condition. The court's error, in other

that Green cannot rely on the theory that his incontinence was itself a disability because (1) Green never raised that theory before the jury or in the court of appeals, (2) no evidence exists that Green "suffered from disability-level chronic incontinence," and (3) no evidence exists that DCS's "relevant decisionmaker knew that Green suffered from chronic incontinence."

We agree with Green that the court of appeals erred by concluding that the only disability the jury could have found was Green's heart condition. Under the Texas Labor Code, a disability includes any "physical impairment that substantially limits at least one major life activity." TEX. LAB. CODE § 21.002(6). A "major life activity" includes activities like "working," but also "the operation of a major bodily function, including ... functions of the ... bladder." *Id.* § 21.002(11-a). Green's urinary incontinence would qualify as a disability if it substantially limited his bladder function or his ability to perform work-related functions. Green argues that his incontinence constitutes such a disability, and DCS terminated him "because of" that disability.

■ DCS responds that Green waived any argument that his incontinence is a disability because that argument was "neither tried to the jury nor argued to the court of appeals." We disagree, as the jury charge squarely presented the issue to the jury. The parties agreed—and the trial court instructed the jury—that Green had a disability, but they left it to the jury to decide what that disability was. Specifically, the charge explained that Green claimed that DCS "terminated his employment because of his disabilities, the side effects of his disabilities, and/or the side effects of the medications he takes to treat

his disabilities." It then explained that DCS "denies" Green's claims and contends that Green's "disabilities did not cause him to urinate on the school bus." Finally, it explained that, regardless of any disabilities, DCS contends that it "had legitimate non-discriminatory reasons for its decisions and actions" because Green's "acts and omissions after urinating on the school bus warranted the termination of his employment."

As worded, the jury charge did not forbid the jury from finding that Green's urinary incontinence was itself a disability. To the contrary, consistent with Green's argument that he suffered from multiple disabilities, the charge referred to "disabilities" in the plural, leaving it to the jury to determine which of his conditions was a disability, and if so, whether DCS terminated him "because of" that disability. Consistent with the charge, Green's counsel argued in closing that the jury should conclude that Green was fired because of his incontinence—a medical condition—as opposed to any other proffered reason: "So if [DCS] contends that no medication and no medical condition caused Mr. Green to [ ] urinate on himself, why haven't they told you why they think he urinated on himself? I'll tell you why, they can't. Because they know a grown man does not urinate in public at work unless there's a medical reason for it."

Even if Green did not expressly "argue" that his incontinence was itself a "disability," we do not agree that he waived that argument. First, before the court of appeals, Green argued that DCS was aware that he had a medical condition that caused him to urinate due to a "fluid pill" he was taking. He also stated several times that he was fired because of the "inconti-

---

words, was that it failed to recognize that Green's urinary incontinence was itself a dis-

ability, not that it required Green to prove the cause of his disability.

nent event on the bus, which DCS considered 'unprofessional,' notwithstanding that it was an involuntary product of his disabilities." Further, the charge itself squarely presented that issue. *See Greene v. Farmers Ins. Exch.*, 446 S.W.3d 761, 764 n.4 (Tex. 2014) ("We do not consider *issues* that were not raised in the courts below, but parties are free to construct new *arguments* in support of issues properly before the Court."). Last, Green did not waive this argument because DCS's appeal from this specific jury verdict necessarily presented that issue to the court of appeals.

■ DCS next contends that Green cannot argue that his incontinence was itself a disability because he submitted no evidence that he suffered from "disability-level chronic incontinence." *See Scavetta v. Dillon Cos.*, 569 Fed.Appx. 622, 625 (10th Cir. 2014) (stating, "there must be some evidence to support the theory that [the disability] substantially limited" the operation of the bodily function at issue) (quoting 29 C.F.R. § 1630.2(j)(3)). According to DCS, Green presented evidence of only a "single episode of urinary incontinence," which, "while doubtless embarrassing, could not possibly rise to the level of a disability." But as DCS itself acknowledges, Green testified that he had suffered urinary accidents due to incontinence both before and after the incident that led to his termination. In addition, Green explained that on several occasions, while riding with several different drivers, he had requested the driver to make an unscheduled stop because he urgently had to urinate. Three physicians—Dr. Strader, Dr. Xavier, and Dr. Feagins—testified about urinary incontinence and its causes. Dr. Strader defined incontinence as "the inability to control your urine." Dr. Xavier described it as "the involuntary loss of urine." Dr. Feagins called it a "common medical condition." We conclude that this evidence, along with

the uncontested evidence that Green suffered from "the involuntary loss of urine" on the occasion for which he was fired, was sufficient to support a finding that his incontinence itself was a disability.

■ Finally, DCS argues that Green cannot show DCS terminated him "because of" his incontinence because he provided no evidence that any DCS "decisionmaker" knew he suffered from that condition. DCS acknowledges Green's testimony that at least three DCS bus drivers knew of his incontinence, but says their knowledge is irrelevant because they were not the "decisionmaker who terminated Green's employment," and they did not share their knowledge with any decisionmakers. Green, however, testified that Johnson, the relevant decisionmaker for DCS, knew Green had a medical condition that caused involuntary urination and that Green told Johnson he "was taking a fluid pill" that caused him to lose bladder control. Green also told his original supervisor he was taking a diuretic.

In any event, the trial court's charge instructed the jury that, for purposes of establishing that DCS "knew of his disability," DCS could act "through its officers *and employees*," not just through its "decisionmakers." DCS did not object to this instruction, so we must measure the sufficiency of the evidence in light of the jury instruction. *Romero v. KPH Consol., Inc.*, 166 S.W.3d 212, 221 (Tex. 2005) ("The sufficiency of the evidence must be measured by the jury charge when, as here, there has been no objection to it."). Consistent with the jury charge, the record contains legally sufficient evidence that the bus drivers, who were DCS employees— and thus DCS itself—knew of Green's urinary incontinence.

DCS conceded, and the jury was instructed, that Green was a qualified individual with a disability. The jury's task

was to decide whether DCS improperly terminated Green "because of" a disability. No one disputes that DCS fired Green because of his urinary incontinence, and based on the jury charge and the evidence presented, we conclude the jury could have found Green's incontinence was itself a disability. The court of appeals thus erred in holding that Green had to prove that his congestive heart failure caused his urinary incontinence.

Accordingly, we grant the parties' petitions for review, and without hearing oral argument, TEX. R. APP. P. 59.1, we reverse the court of appeals' judgment and remand to that court for consideration of issues it did not reach.