# IN THE SUPREME COURT OF TEXAS

════════════

No. 17-0970

════════════

OFFICE OF THE ATTORNEY GENERAL OF TEXAS, PETITIONER,

v.

LAURA G. RODRIGUEZ, RESPONDENT

════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE EIGHTH DISTRICT OF TEXAS

════════════════════════════════

**Argued September 24, 2019**

JUSTICE BLAND delivered the opinion of the Court.

JUSTICE BOYD AND JUSTICE BLACKLOCK did not participate in the decision.

In this case, we decide whether sufficient evidence exists to support a finding that a state agency violated the Texas Whistleblower Act when it fired one of its managers.[1] The trial court entered judgment based on jury findings that the agency violated the Act, and the court of appeals affirmed. Under *City of Fort Worth v. Zimlich*, no evidence demonstrates that the manager's report of a violation of state law fifteen months earlier caused the agency to terminate the manager's employment.[2] Accordingly, we reverse and render.

---

[1] *See* TEX. GOV'T CODE § 554.002.

[2] *City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 67 (Tex. 2000).

# I

## A

Laura Rodriguez began employment in the El Paso County child-support office in 1981. In 1985, the Office of the Attorney General became the statewide manager of the state's child-support services. Rodriguez became an agency employee and, over the years, worked as a child-support officer, a call-center manager, and a regional manager.

In 2004, Charles Smith was named the agency's deputy director for child-support services. Smith promoted Rodriguez to her regional manager position in 2005. As the El Paso regional manager, Rodriguez reported to Smith. He gave her outstanding evaluations for the three years following her promotion.

In 2007 and 2008, Smith and other agency staff began to receive complaints about Rodriguez's management. In 2007, an anonymous letter complained that Rodriguez had caused turnover because she threatened her management team, was overly controlling, and created "a very hostile working environment." Smith spoke to Rodriguez, and he accepted her explanation that an office manager who was upset over Rodriguez's criticism and harbored a grudge against Rodriguez for having been promoted had made the complaint. In his performance evaluation, Smith described Rodriguez as having positively handled this management challenge.

Six months later, in July 2008, two management-level employees who worked for Rodriguez resigned. They sent a letter complaining that Rodriguez had engaged in "abusive micro-management," "vicious brow-beating," and "hostile" relationships that had reduced "managers to tears of despair, humiliation, and anger." Smith and Rodriguez discussed this letter. Rodriguez explained that these employees were also disgruntled. Smith encouraged her to make sure she was

2

"being fair" and developing her managers, but he did not discipline Rodriguez for these complaints.

Debbie Galindo began working in the El Paso child-support office while Rodriguez was a child-support officer. Galindo and Rodriguez became friends and grew as close as "sisters." When Rodriguez became regional administrator, she named Galindo her executive assistant. Explaining that she frequently travels for work, Rodriguez required Galindo to provide Rodriguez with login access to Galindo's email account.

On New Year's Day 2009, Rodriguez logged into Galindo's email account. Rodriguez found an email referencing "family status." Believing it involved another employee, Rodriguez opened the email. It was an email to an agency benefits specialist. Galindo wrote in the email that she had added her "niece," Annika Macias, who had "recently come to live with" Galindo in December, to Galindo's health insurance.

Rodriguez knew that Annika was not Galindo's niece. Annika instead was the mother of Galindo's grandchild and had a relationship with Galindo's son. Believing that Galindo had made a false statement about Annika to add her to Galindo's state health insurance plan, Rodriguez called Smith and reported Galindo's email on Sunday, January 4.

At trial, Rodriguez and Smith provided different details about this call, but neither disagreed with the other's account. Rodriguez testified that Smith initially told her not to do anything until he spoke with the agency's ethics advisor. Agency policy required employees to report suspected legal violations to the ethics advisor. Rodriguez told Smith that she wanted to remain anonymous, as the agency's fraud policy permitted. By the end of the conversation, Smith agreed that Rodriguez had "to do something" about the email and had "to report it."

Smith testified that he at first misunderstood Rodriguez, thinking that Galindo had received the email from the state Employees Retirement System (ERS). He asked Rodriguez to find out from Galindo whether ERS had made an error and to ask Galindo for an explanation. Smith described Rodriguez's reluctance to ask Galindo about the email as "odd."

Rodriguez did not dispute that Smith was confused about who had sent the email. Both agreed that Rodriguez eventually made it clear that she wanted to report the email anonymously and not discuss it with Galindo. Both testified that, by the end of the call, Smith told Rodriguez to report the email to the ethics advisor. According to Rodriguez, Smith called her the next day, reported that he had spoken with the ethics advisor, and gave Rodriguez the ethics advisor's phone number. Smith testified similarly, except he stated that he provided the ethics advisor's number to Rodriguez but did not speak with him. The ethics advisor testified that Rodriguez was the first to speak with him about the email.

Rodriguez testified that, in her conversation with the ethics advisor, she identified herself but emphasized her desire to remain anonymous.[3] She discussed the email and reported that Annika was not Galindo's niece. By February 2009, Rodriguez had not heard back from the ethics advisor. She asked Smith about the matter. Smith called the ethics advisor, and the ethics advisor said that he had referred the matter to the agency's criminal-investigations division.

In March 2009, Captain Greg Lucas called Rodriguez. He told her that he planned to interview Galindo. In a meeting in El Paso on March 30, Lucas confirmed to Rodriguez that the agency had opened an investigation and he would preserve her anonymity. Later that day, Galindo,

---

[3] The ethics advisor testified that Rodriguez's January 5 phone call to him was anonymous. He said that he did not know that the caller was Rodriguez until "six, [or] seven months later."

4

crying, reported to Rodriguez that Lucas was investigating Galindo. Rodriguez did not reveal to Galindo that she had reported her, and she encouraged Galindo to see how things worked out.

On May 4, Lucas issued a report that Galindo had "provided false information" in her email, and Annika did not "meet the requirements to be a dependent eligible for enrollment" on Galindo's insurance plan. When the ethics advisor read the report, he agreed that Galindo had stated falsely that Annika was her niece. But the benefits specialist who had received Galindo's email had reported to him that Annika was an eligible dependent if Annika lived with Galindo. The ethics advisor requested the criminal-investigations division to further investigate whether Galindo legally could have claimed Annika as a dependent.

On June 30, Smith traveled to El Paso to meet with Rodriguez to discuss her written "rebuttal" to a program report describing the El Paso office.[4] When the investigation came up, Smith told Rodriguez that Galindo had stated falsely that Annika was Galindo's niece. But, based on information from the benefits specialist, the ethics advisor had concluded that Galindo did not commit fraud because Annika had lived with Galindo at the time, making her eligible to be included on the policy. Rodriguez replied that this conclusion was incorrect because Annika had never lived with Galindo. When Smith asked how Rodriguez knew that, Rodriguez explained that Annika and Galindo's son had rented a house from Rodriguez's sister at the time. Before that point, Rodriguez had not disclosed her connection to Annika. Smith and Rodriguez together called the

---

[4] Rodriguez received a "Program Excellence Review" report, which is a review of a region's office that is intended to extol and share the office's best practices with other offices across the state. Rodriguez believed parts of the report's characterization of a particular office's "best practices" and "challenges" were inaccurate, so she prepared a "rebuttal" that she submitted to Smith.

ethics advisor and Jo Kirkel, an attorney in the agency's human-resources division, and shared this information.

Two weeks later, on July 15, Lieutenant Paul Hall interviewed Rodriguez about Annika's residence at the time Galindo sent the email. Rodriguez testified that she told Hall that Galindo's son and Annika had rented a house from Rodriguez's sister. The next day, Hall issued a report. Hall reported that Rodriguez said that she and her husband "managed" the house and collected the rent from Galindo's son through December 2008. And Rodriguez herself rented a different house to Galindo's daughter, Jennifer. Hall reported that Rodriguez said that she "didn't want the [agency] to think that she reported [Galindo's email] in retaliation to [Annika and Galindo's son] moving out of the house."

Hall also interviewed Galindo, Galindo's son, and Annika. Hall confirmed that Galindo's son leased a house from Rodriguez's sister and the utilities were in Annika's name. But they claimed that the house had water heater, septic, and mold problems, and as a result, Annika and Galindo's grandchild had moved into Galindo's house by mid-to-late December 2008. They claimed that Annika remained at Galindo's house through February or March 2009. In the report, Hall states that Rodriguez confirmed the water heater, mold, and septic problems, but stated that her husband had repaired them, and Galindo's son paid discounted rent "to compensate him."

Ultimately, Hall could not make a "definitive determination" about Annika's residence. Relying on Hall's report, the ethics advisor declined to find that Galindo had committed insurance fraud because Annika could have qualified as Galindo's dependent. The ethics advisor found, however, that Galindo had stated falsely that Annika was her niece. On July 31, he referred the matter back to the child-support division "for a probable disciplinary action due to Ms. Galindo's

6

misstatement to the benefits specialist." Smith recommended that Galindo serve a five-day suspension, which his boss, Alicia Key, approved.

During that summer, Smith and others in the agency received additional letters from agency employees complaining about Rodriguez's management. Smith asked two members of his team, Dalia Perez and Mara Friesen, to meet with Rodriguez's staff about the complaints. On August 13, Perez and Friesen met with Rodriguez to discuss their findings. According to Rodriguez, Perez and Friesen raised her "business relationship" with Galindo[5] during the meeting, but she conceded that they also addressed a recent complaint, her failure to fill a manager position with an available candidate, her "rebuttal" to the June program report, and the difficulties she was having with her subordinates. Rodriguez became upset during the meeting because Perez and Friesen "would not listen" to her. Perez suggested that Rodriguez speak with the agency's ombudsman.

Rodriguez called the agency's ombudsmen, as Perez had suggested. Rodriguez told the ombudsman about Galindo's email and her meeting with Perez and Friesen. She reported that her managers scrutinized everything she did, and she feared she was going to be fired or demoted. She testified that the ombudsman did not "want to hear it" and did not believe her.

Upon their return from El Paso, Perez and Friesen reported to Smith that Rodriguez was failing to maintain effective working relationships and making unsound management decisions. Rodriguez's team had lost confidence in her, and Rodriguez had lost faith in her team, too. They reported to Smith that Rodriguez had no plan to improve the situation.

---

[5] Rodriguez denied she had a "business relationship" with Galindo and emphasized that "the relationship had been with the daughter."

7

In August, Perez asked Rodriguez to prepare a report suspending Galindo for five days for violating agency policy. Rodriguez revealed to Perez that she was the one who had reported Galindo and said that agency policy prohibited her involvement. Rodriguez also questioned the five-day suspension, stating that, in her view, termination was more appropriate. Nevertheless, Rodriguez prepared the report as instructed and emailed it to Perez. In the email, she quoted agency policy: "An individual who reports an alleged [fraud] violation shall not be privy to details or other information gathered during an investigation, including the results of an investigation." Rodriguez expressed concern that it could look like she "took personal retribution against Debbie Galindo." Rodriguez asked to recuse. Because Rodriguez was the regional administrator and Galindo's direct supervisor, Smith thought Rodriguez's email was "strange" and Alicia Key also thought it "odd." Key described it as "inconsistent with what [Rodriguez] had done in the past with respect to other employees." Smith nevertheless agreed to meet with Galindo in El Paso and deliver the suspension.

About a month after Perez and Friesen met with Rodriguez, on September 4, Smith drafted a proposal to fire Rodriguez. In the draft, Smith stated that "complaints continue to be received" about Rodriguez "and the region continues to experience a high turnover rate among its management staff." Rodriguez had "feelings of distrust" of Smith, his team, and her subordinates, affecting "her ability to honestly communicate with her supervisors." Among Rodriguez's "recent, problematic, and unacceptable management decisions or actions," he listed: her refusal to follow his directive to fill a vacant manager position with a qualified candidate who needed three weeks to relocate, instead taking on the position herself; filing a rebuttal to the June program report contrary to his instructions; proposing an unwarranted warning to a subordinate (not Galindo); complaining to Perez and Friesen that their "investigation into anonymous letters [complaining of

8

Rodriguez was] an attack against her" and "serve[d] to undermine her authority"; refusing to administer the suspension to Galindo; and creating a "conflict of interest" with a subordinate by renting or managing houses in which Galindo's children lived. He described Rodriguez as having "unacceptable behavior toward regional managers and staff." Smith shared his draft with Kirkel, the human-resources division attorney. She advised Smith to demote Rodriguez rather than fire her. Smith agreed.

On September 22, Smith and Perez met with Galindo in Rodriguez's office to administer Galindo's five-day suspension. Rodriguez remained in her office but did not say anything to Galindo. After excusing Galindo, Smith told Rodriguez he planned to remove her as the regional administrator. Smith began to discuss the written disciplinary report he had prepared, which Key had approved. As Smith began, Rodriguez interrupted him. She offered to take a voluntary demotion to the then-vacant position as manager of the El Paso child-support case-initiation office.[6] Smith agreed, and they immediately exchanged emails confirming their understanding.

Because Rodriguez had volunteered for the demotion, Smith never gave Rodriguez the disciplinary report. Rodriguez became the manager of the El Paso case-initiation office the next morning, September 23. At that point, Rodriguez no longer reported to Smith but to other regional managers who rotated through the position.

---

[6] Smith later reported that Rodriguez stated "she had been thinking about stepping down from the [regional administrator] position for a period of time because of the travel and stress associated with the position." Galindo also testified that Rodriguez told her before the meeting that she was "going to take a voluntary demotion" because she was dealing with "a lot of family issues," including her mother's poor health, and had "too much going on at the time personally in her family." Rodriguez disputed those accounts at trial, however, stating that she volunteered for the demotion because she "didn't want to be fired."

On December 22, Smith emailed Rodriguez her regional manager performance evaluation for the fiscal year that had ended four months earlier on August 31, 2009. He gave Rodriguez an overall "Satisfactory" rating, but he rated her negatively in a few categories. On the positive side, he noted that Rodriguez "personally took on more and more responsibilities to ensure the success of the region." He observed, however, "While these qualities are initially admirable and desirable, they can and often do create other problems." In the areas of "leadership and decision-making" and "communication," Rodriguez met "most standards" but "continued to struggle with interpersonal relationships with her direct reports," made "a series of mistakes and missteps," and "failed to connect with members of her management team throughout her tenure." And for "standards and ethics," she "did not meet" expectations because she "entered into a business arrangement with a subordinate's family member," which "cast doubt" on the complaint she made about Galindo's email and "created a conflict of interest which kept [her] from administering a disciplinary action against the employee."

Rodriguez sent Smith a written rebuttal to her evaluation on January 29, 2010. She denied that she had management issues with her direct reports, claimed she was not aware of these concerns, and insisted that she had handled the Galindo matter correctly. She wrote that she became a "target" after she reported Galindo and that Smith's "evaluation constitutes retaliation." She requested an investigation and forwarded a copy to the agency's human-resources director.

At the beginning of January, Smith hired Onieda Duberney to be the El Paso regional manager. Duberney had previously worked for the child-support division, but her immediate past employment had been in the private sector. Duberney requested that Rodriguez work to alleviate

the existing backlog in the case-initiations office. Duberney grew increasingly frustrated with Rodriguez's failure to meet deadlines and reduce that backlog.

On March 11, Rodriguez filed a written complaint with the agency's ombudsman. She alleged that she had been "discriminated and retaliated against" because she had reported Galindo. Though Galindo was unaware that Rodriguez had reported her until this suit, Rodriguez demanded that Galindo stop "harassing" her, making "derogatory comments against" her, and that Duberney stop "micromanaging, undermining and subverting" her responsibilities.

Unaware of Rodriguez's ombudsman complaint, on March 12, Duberney drafted a request that the agency fire Rodriguez. Duberney stated that Rodriguez had missed two regional managers' meetings,[7] did not know the number of backlogged cases or the cause of the backlog, missed two deadlines to refer 600 backlogged cases to other offices, did not demonstrate a plan to "ensure the backlogs were cleared," and had referred incomplete case files to other offices assisting with the backlog. Rodriguez demonstrated an "inability to efficiently and effectively operate" the case-initiations office and "comply with agency policy and procedures," causing other offices that depended on timely case-initiations to "be negatively impacted." At trial, Rodriguez disputed Dubernery's view, testifying that the "whole problem" was "that Oni Duberney was not being clear as to what she expected of the staff."

Duberney prepared a second draft request on March 19, which the region's senior attorney, Debra Morgan, signed. That recommendation was nearly identical to the initial draft. On April 7,

---

[7] Rodriguez produced a doctor's note excusing her from work during the first meeting for a throat infection and FMLA paperwork showing that she would be caring for her mother during the second meeting.

Duberney submitted the request to Smith.[8] Morgan, Smith, and Key approved the request. Duberney fired Rodriguez the following day, on April 8.

## B

Rodriguez sued the agency, complaining that it violated the Whistleblower Act because it fired her in retaliation for reporting Galindo. Rodriguez also alleged that the agency retaliated by forcing her to take a demotion in September 2009. The trial court dismissed the demotion claim, however, because Rodriguez did not timely file a grievance or assert that claim. The court of appeals affirmed this ruling in an interlocutory appeal, and Rodriguez does not challenge that judgment.[9] Thus, our review is confined to the agency's decision to fire Rodriguez in April 2010. The jury found that Rodriguez had made a good-faith report of a violation of law that caused the agency to terminate her employment. The trial court entered judgment on the verdict, awarding damages plus interest and attorney's fees. The court of appeals affirmed.[10]

The court of appeals concluded that Duberney's lack of knowledge about the Galindo matter did not destroy any causal link to Rodriguez's protected action under the Whistleblower Act because Duberney "had no authority to make the decision to terminate Rodriguez on her own."[11] As evidence of causation, the court of appeals observed that, while Duberney did not know

---

[8] Also on April 7, the ombudsman sent a letter responding to the official complaint Rodriguez submitted on March 11. Unaware that Duberney planned to terminate Rodriguez, the ombudsman recommended Rodriguez "continue to work with" Duberney "to resolve differences that may arise." Rodriguez received the ombudsman's letter after she was fired.

[9] *See Office of Att'y Gen. v. Rodriguez*, 420 S.W.3d 99, 101 (Tex. App.—El Paso 2012, no pet.). As a result, her only claim at trial was that the OAG retaliated by *terminating* her employment in April 2010.

[10] 535 S.W.3d 54, 59 (Tex. App.—El Paso 2017).

[11] *Id.* at 73; *see also id.* at 73 n.17.

about the matter, Key learned in the summer of 2009 that Rodriguez had reported Galindo.[12] The lack of evidence that Key had a negative attitude toward the Galindo report, the court concluded, did not matter, because Key and Smith were joint decisionmakers.[13] And Smith had displayed a negative attitude by asking whether Rodriguez should clarify the situation with Galindo, relying on Rodriguez to report the complaint, questioning Rodriguez's desire to remain anonymous, and asking her to suspend Galindo when the investigation concluded.[14] Though Duberney did not know about the Galindo matter, the court of appeals nevertheless concluded that evidence existed that the Galindo report had caused Rodriguez's termination because whether Rodriguez was "performing satisfactorily" when she was fired "was certainly subject to dispute,"[15] and Rodriguez's successor received favorable disciplinary treatment in comparison.[16] We granted review.

## II

### A

The Whistleblower Act prohibits a government employer from taking an adverse personnel action against a public employee who in good faith reports a violation of law to an appropriate law-enforcement authority. TEX. GOV'T CODE § 554.002(a). To recover against a government

---

[12] *Id.* at 74.

[13] *Id.* at 75.

[14] *Id.* at 75–77.

[15] *Id.* at 82.

[16] *See id.* at 78–80.

13

employer, the employee must establish that the employer imposed the personnel action "*because the employee made the report.*"[17]

The Act imposes liability if an employee's report causes an adverse employment action, but it preserves an employer's right to fire an employee when it has "sufficient sound reasons" or even "harbor[s] bad motives never acted upon."[18] The Act thus does not afford unlimited protection from adverse personnel actions based on legitimate reasons.[19] And while the Act protects making a report, it does not protect an employee from personnel actions based on the employee's unprotected conduct after the report is made.[20]

A government employee need not prove that the report was the "sole" or the "substantial" reason for the adverse personnel action, but the employee must prove that the adverse action "would not have occurred when it did" if the employee had not reported the violation.[21] An adverse employment action "based solely" on reasons unrelated to a good-faith report of a legal violation destroys the causal link.[22]

---

[17] *Tex. Dep't of Human Servs. v. Hinds*, 904 S.W.2d 629, 633 (Tex. 1995) (citing Tex. Gov't Code § 554.004(a) (providing a rebuttable presumption that a public employee was terminated "because the employee made the report" if an adverse personnel action occurs "not later than the 90th day" after the report is filed)). In this case, no presumption exists because the challenged action occurred fifteen months after the report.

[18] *Id.* at 635–36.

[19] *Id.* at 635 ("An employer who has sufficient sound reasons for discharging an employee should not incur liability merely for disliking the employee for reporting illegal conduct when that dislike played no part in the disputed personnel action.").

[20] *See, e.g.*, *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 764 (Tex. 2018) (noting that the Texas Commission on Human Rights Act's "prohibition against retaliation does not protect employees from all ostracism, discipline, or even termination following a discrimination complaint"); *Hinds*, 904 S.W.3d at 635 (noting that the Whistleblower Act does not impose liability against government employers for disliking an employee, or even "for disliking the employee for reporting illegal conduct").

[21] *Hinds*, 904 S.W.2d at 634–36.

[22] *See City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 67 (Tex. 2000) (explaining that the employee must demonstrate that the adverse personnel action "would not have occurred when it did if the employee had not reported the illegal conduct" (citing *Hinds*, 904 S.W.2d at 633)). Section 554.004(a) expressly requires the plaintiff to bear the burden of proving causation, but subsection (b) provides an "affirmative defense" when the adverse employment

14

In this case, the agency challenges that causal link. No direct evidence shows that the agency fired Rodriguez for reporting Galindo fifteen months earlier. Rodriguez, however, points to circumstantial evidence from which, she contends, a jury reasonably could infer causation. We review that evidence in a light favorable to the jury's finding and examine "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review."[23]

In *City of Fort Worth v. Zimlich*, we observed that circumstantial evidence may be enough to show a retaliatory motive when it demonstrates:

> (1) knowledge of the report of illegal conduct, (2) expression of a negative attitude toward the employee's report of the conduct, (3) failure to adhere to established company policies regarding employment decisions, (4) discriminatory treatment in comparison to similarly situated employees, and (5) evidence that the stated reason for the adverse employment action was false.[24]

But we cautioned that "evidence that an adverse employment action was preceded by a superior's negative attitude toward an employee's report of illegal conduct is not enough, standing alone, to show a causal connection between the two events. There must be more."[25] The time that passes between the protected conduct and the adverse personnel action is also relevant to any causal connection.[26]

---

action is "based solely" on reasons unrelated to the employee's good-faith report of a legal violation. TEX. GOV'T CODE § 554.004(a), (b). In *Zimlich*, we stated that "the employee must demonstrate all elements of the action, including causation, by a preponderance of the evidence," without addressing whether subsection (b) shifts part of the burden of proof to the defendant. 29 S.W.3d at 67. The jury charge in this case placed that burden on Rodriguez, and no party challenges that burden on appeal.

[23] *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *see also Alamo Heights*, 544 S.W.3d at 771 (applying legal-sufficiency standards to resolve fact disputes in a jurisdictional plea).

[24] *Zimlich*, 29 S.W.3d at 69; *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 451 (Tex. 1996).

[25] *Zimlich*, 29 S.W.3d at 69.

[26] *See Alamo Heights*, 544 S.W.3d at 790.

In *Zimlich*, we held that no evidence existed to support a jury's finding that the employee's whistleblower report caused his promotion board to deny him a promotion eight months later, despite concluding that the evidence was sufficient to support the claim that the employee's earlier reassignment was causally connected to the report.[27] The supervisor who reassigned the employee told the employee that he was "lucky to have a job at all."[28] Even though this supervisor later served on the employee's promotion board, we held that the jury could not infer causation absent "evidence that [he] somehow influenced the result of the panel" or evidence that the panel used "different criteria" in making the decision for that employee.[29] In rejecting the notion that the supervisor's motive was imputed to the panel's decision, we observed, "If an employee who reports illegal conduct can recover without evidence of causation, it would effectively give the employee life tenure—a proposition we expressly rejected in *Hinds*."[30]

In that vein, a supervisor's statement that the employee would face "consequences" for a complaint was "vague and so devoid of context" that it was insufficient to infer causation.[31] And while knowledge of the report is a form of circumstantial evidence, if a decisionmaker became aware of the report after deciding to terminate the employee, there can be no inference of causation from that knowledge.[32]

---

[27] *Zimlich*, 29 S.W.3d at 71.

[28] *Id.* at 69.

[29] *Id.* at 69–70.

[30] *Id.* at 68 (citing *Tex. Dep't of Human Servs. v. Hinds*, 904 S.W.2d 629, 633 (Tex. 1995)).

[31] *Alamo Heights*, 544 S.W.3d at 790.

[32] *Id.* (citing *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001)).

In determining causation, we focus on those with authority in the decision-making process that resulted in the adverse employment action and whether there is evidence "that the decision-maker or decision-makers" acted with a retaliatory motive.[33] Evidence of one decisionmaker's improper motive, however, cannot be imputed to all of the decisionmakers—or to the final decision—without evidence that the improper motive influenced the final decision.[34]

**B**

The agency contends no evidence exists that either Alicia Key, the child-support division director who approved Rodriguez's termination, or Duberney, who recommended the termination, were motivated by Rodriguez's report of the Galindo email. Duberney was not employed in the child-support division when Rodriguez reported Galindo. She did not know about the report when she proposed that the agency fire Rodriguez. Key relied on Duberney's report in firing Rodriguez, which Smith did not amend. As the decisionmaker with the final authority to fire Rodriguez, the agency argues, Key properly relied on Duberney's report, which was not based on a protected activity but on poor performance in her role in the case-initiations office.[35] The agency further

---

[33] *See, e.g.*, *Harris County v. Vernagallo*, 181 S.W.3d 17, 25–26 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) (basing employer's liability on motives of employee who had "the authority to hire and fire without consulting any other person or board" and who "took the adverse employment action"); *Gee v. Principi*, 289 F.3d 342, 346 (5th Cir. 2002) (explaining that courts focus "on the final decisionmaker" because the "statements and actions of ordinary employees are normally not imputable to the employer").

[34] *See Zimlich*, 29 S.W.3d at 70 (finding no evidence "that the decision-maker or decision-makers" acted with a retaliatory motive even when supervisor with improper motive served on promotions board).

[35] *See, e.g.*, *Green v. Dall. Cty. Sch.*, 537 S.W.3d 501, 506 (Tex. 2017) (per curiam) (focusing on employer's "relevant decisionmaker"); *Zimlich*, 29 S.W.3d at 70 (focusing on employer's "decision-maker"); *Alief Indep. Sch. Dist. v. Perry*, 440 S.W.3d 228, 240–41 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (focusing on person with "authority to hire and fire"); *Vernagallo*, 181 S.W.3d at 25–26 (focusing on the "person who took the adverse employment action" and who "had authority to hire and fire"); *City of Fort Worth v. Johnson*, 105 S.W.3d 154, 164 (Tex. App.—Waco 2003, no pet.) (focusing on "the person who ultimately made the decision to fire the employee"); *see also Equal Emp't Opportunity Comm'n v. EmCare, Inc.*, 857 F.3d 678, 683 (5th Cir. 2017) (focusing on "the person who decided to terminate" the employee); *Gee*, 289 F.3d at 346 (observing the "longstanding principle that, in determining whether an adverse employment action was taken as a result of retaliation, our focus is on the final decisionmaker" (citing *Long v. Eastfield Coll.*, 88 F.3d 300, 306–07 (5th Cir. 1996))); *Beattie v. Madison Cty. Sch.*

challenges the sufficiency of the evidence to find that Smith had an improper motive in approving the termination.

Rodriguez responds that Smith approved the decision to fire Rodriguez, and Smith was motivated to fire Rodriguez because she had reported Galindo; thus, the evidence demonstrates a causal connection. She further notes that the jury charge inquired about the agency's decision, not any individual decisionmaker. Essentially, Rodriguez argues that any decisionmaker with an improper motive is a but-for cause of an adverse employment action, even if the decision would be the same without the participation of that decisionmaker. The lynchpin of Rodriguez's case is that Smith was the "captain who steered the ship that led to . . . a lost job." Rodriguez argues that Smith exhibited a "negative attitude" about the report because Smith asked her to ask Galindo about the email, referred Rodriguez to the ethics advisor rather than making the report himself, requested that Rodriguez notify Galindo of the suspension, and planned to fire Rodriguez a month after the investigation concluded (though he did not).

With respect to Duberney, Rodriguez argues that Duberney made unreasonable demands and violated agency policy when she based her termination decision not just on Rodriguez's conduct in the current evaluation period but also on Rodriguez's recent experience as regional manager. Further, the final recommendation approved by the senior attorney as well as Smith and Key attached a memo that recounted Rodriguez's request for a voluntary demotion and an oral warning she received "because of her previous actions which generated complaints and a conflict

---

*Dist.*, 254 F.3d 595, 604–05 (5th Cir. 2001) (focusing on school board, which decided to terminate a secretary, rather than principal or superintendent who recommended termination but were not "policymakers"); *Long*, 88 F.3d at 306–07 (focusing on college president who "made the final termination decisions," rather than on plaintiffs' supervisors who recommended the terminations).

18

of interest involving a subordinate (rental property)." As for Key, Rodriguez argues that Key did not sign the written request for termination[36] and Rodriguez's successor received more favorable disciplinary treatment, which Key approved. Thus, she contends, Duberney and Key's reasons for firing Rodriguez were pretextual.

The trial court instructed the jury that "Rodriguez must prove that without the good faith report of violation of law, her termination would not have occurred when it did," and that "but-for" causation is necessary: "An employer does not retaliate against an employee for reporting a violation of law, in good faith, to an appropriate law enforcement authority, unless the employer's action would not have occurred when it did had the report had not been made."

## C

The evidence does not support a finding that Smith approved Rodriguez's termination based on an improper motive. When Rodriguez told Smith about Galindo, Smith asked whether Rodriguez should ask Galindo whether there was an error or mistake. Smith testified that he found Rodriguez's hesitance to speak with Galindo and request for anonymity to be "odd" and "strange."

Though agency policy prohibits whistleblowers from speaking with a person suspected of violating the law and directs supervisors to make complaints on behalf of their employees, in this case, Rodriguez herself *was* the supervisor—she was the administrator for the region and Galindo's direct supervisor, with managerial authority over Galindo's employment. Rodriguez does not dispute, moreover, that Smith was initially confused about who had sent the email and was concerned that a "bad faith allegation" could result without clarification. Once it was clear

---

[36] Key testified that she approved Rodriguez's termination, but her signature does not appear on the termination-request form. Key explained that her signature was not required on the request form, but she would have signed a personnel action form that is usually attached to the request form.

who sent the email, Smith and Rodriguez agreed that Rodriguez should report it, anonymously, and she did so the next day. All agree that Smith provided Rodriguez with the ethics advisor's information. As Rodriguez herself testified, by the time the phone call ended, Smith told her she "needed to do something" and "needed to report it," and then he promptly followed up to help her make the report the next day. Smith's handling of Rodriguez's phone call does not raise an inference of a retaliatory motive.[37]

Rodriguez also relies on Smith's December 2009 evaluation, after the investigation was complete, in which he stated that Rodriguez's "business arrangement with [Galindo's] family member . . . cast doubt on the complaint," and further relies on Smith's questioning of her refusal to tell Galindo about the suspension once the investigation was complete. Smith learned of Rodriguez's rental-house relationship with Annika—and Rodriguez's personal knowledge of the underlying facts—after Rodriguez made the report. Rodriguez herself raised a concern that her involvement in the rental business could "make it appear" that she had retaliated against Galindo— she provided it as one reason that she did not want to deliver the suspension.

Neither Rodriguez's failure to disclose her rental-house relationship with Galindo's children and Annika, nor her refusal to discipline her subordinate employee after the completion of an investigation, are protected activities. The Whistleblower Act does not prohibit employers from terminating an employee based on conduct that arises after the employee reports a legal violation.[38] As Rodriguez's supervisor, Smith's statement in an evaluation that Rodriguez

---

[37] *See Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 451–52 (Tex. 1996) (holding that supervisor's questioning whether an employee's injury might have resulted from non-compensable causes was not "probative" to demonstrate a negative attitude).

[38] *See Tex. Dep't of Human Servs. v. Hinds*, 904 S.W.2d 629, 635 (Tex. 1995); *see also Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 764, 791–92 (Tex. 2018).

exercised poor professional judgment in failing to disclose her involvement in the underlying facts does not demonstrate a negative attitude about Rodriguez's report, but rather about her failure to disclose her personal involvement until months later. And, despite thinking that it was odd that Rodriguez did not want to discipline Galindo, Smith and Perez traveled to El Paso to suspend Galindo, who was Rodriguez's subordinate. The Whistleblower Act does not impose liability against government employers for disliking an employee, or even "for disliking the employee for reporting illegal conduct." *Tex. Dep't of Human Servs. v. Hinds*, 904 S.W.2d 629, 635 (Tex. 1995). Instead, the Act imposes liability only when the employer's dislike for the protected conduct "played [a] part in the disputed personnel action," *id.* at 635, and that action occurred "because" the employee reported a legal violation.[39] Rodriguez does not point to circumstantial evidence that allows an inference that Smith approved her termination based on a retaliatory motive.

**D**

Similarly, there is no evidence that Smith pressed Duberney and Key—either directly or subtly—to terminate Rodriguez. Rodriguez does not argue that Key or any other agency employee exhibited a negative attitude about Rodriguez's report. The court of appeals concluded that this lack of evidence did not destroy a causal link to the report because Smith had a retaliatory motive, and as a participant in the decision, his improper motive can be imputed to the final decision. This is contrary to *Zimlich*, in which we held that the evidence must show that the retaliatory motive was shared by the necessary final decisionmakers and reflected in the final decision.[40]

---

[39] *Zimlich*, 29 S.W.3d at 67 (citing *Hinds*, 904 S.W.2d at 633); *see Alamo Heights*, 544 S.W.3d at 764 ("[Under the Texas Commission on Human Rights Act,] a remedy exists only when the evidence establishes that a materially adverse employment action resulted from the employee's protected activities.").

[40] *Zimlich*, 29 S.W.3d at 69–70 (holding that, to support a causation finding with multiple decisionmakers, "there would have to be evidence from which a fact finder could reasonably infer that discrimination was a factor in

21

The court of appeals erred in disregarding Duberney's lack of retaliatory motive for proposing Rodriguez's termination and determining that Duberney's lack of knowledge did not attenuate any retaliatory motive.[41] As the regional administrator hired after the investigation's conclusion, Duberney supervised Rodriguez without knowledge of the report. Duberney learned about the Galindo report *after* she drafted the request that the agency terminate Rodriguez. After learning about the report, Duberney's reasons for termination did not change; her submitted request was nearly identical to her draft request. Duberney's lack of knowledge does not permit an inference that she sought to fire Rodriguez in retaliation for the report.[42] And her recommendation formed the basis for both Key and Smith's decision. Duberney thus was a decisionmaker who could not have retaliated against Rodriguez based on the Galindo report.[43]

Rodriguez responds that an employee need not show both a pretext for terminating an employee and a retaliatory motive to prove causation, and Duberney's reasons for firing her were pretextual. The court of appeals agreed, concluding that there was evidence that Rodriguez "worked diligently," did not intentionally refuse to follow Duberney's directives, and made "inroads" on Office 807's backlogs.[44] Without evidence that Duberney knew about the report, however, her stated reasons could not be pretextual. "Carrying out a previously planned

---

the decision process"). In *Zimlich*, the Court concluded that the evidence supported the jury's finding that Zimlich's supervisor had an improper motive in reassigning Zimlich. *Id.* at 69. But the same supervisor's participation in the later promotions board decision did not provide a causal link without evidence that the other board members were similarly motivated. *Id.* at 69–70.

[41] *See* 535 S.W.3d 54, 73 & 73 n.17 (Tex. App.—El Paso 2017).

[42] *See Alamo Heights*, 544 S.W.3d at 790; *Canutillo Indep. Sch. Dist. v. Farran*, 409 S.W.3d 653, 656 (Tex. 2013) (per curiam); *see also Watts v. Kroger Co.*, 170 F.3d 505, 512 (5th Cir. 1999) (holding that for a Title VII claim, the decisionmaker could not have retaliated because it "did not know" that employee "had engaged in protected activity").

[43] *Alamo Heights*, 544 S.W.3d at 790; *Farran*, 409 S.W.3d at 656.

[44] 535 S.W.3d at 80–83.

employment decision is no evidence of causation."[45] Duberney had no retaliatory motive for firing Rodriguez based on a report she knew nothing about, and her reasons were not a pretext for that motive.[46] The evidence that the court of appeals relied on does not create an inference that Rodriguez was terminated because of the Galindo report.

In approving Rodriguez's termination, Key relied on Duberney's report, which was not based on a retaliatory motive. There is no evidence that Smith influenced Key to terminate Rodriguez or supplied Key with pretextual justifications.[47] Although Smith also reviewed and approved Duberney's request, he did not supplement or change it. Duberney's recommendation, which has no causal connection to the Galindo matter, supplied independent reasons for termination connected to Rodriguez's performance as manager of the case-initiations office. Key's approval, based on that recommendation, has no causal link to Rodriguez's protected activity in making the report.

Rodriguez argues that circumstantial evidence supports an inference that Smith's improper motive is attributable to Key because Key had approved Smith's earlier request to demote Rodriguez, and the request cited Rodriguez's rental-property relationship with Galindo's children as one basis for the demotion. But Rodriguez revealed that relationship *after* she reported Galindo,

---

[45] *Alamo Heights*, 544 S.W.3d at 790; *see also Farran*, 409 S.W.3d at 656 (holding that, when a school board "suspended" an employee and "gave notice of its intent to terminate him," the employee's subsequent filed report is not a cause of the employee's termination unless the employee shows that "but for that report, the school district would have changed its mind and retained him").

[46] *Alamo Heights*, 544 S.W.3d at 791 ("An employer is not forbidden from addressing performance issues involving employees who have engaged in protected activity . . . .").

[47] *See City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 70 (Tex. 2000); *see also Gee v. Principi*, 289 F.3d 342, 346 (5th Cir. 2002).

23

and her revelation of an outside business relationship with a subordinate's children is not protected conduct under the Whistleblower Act.

The remaining *Zimlich* factors are unavailing. Rodriguez argues that Key's signature was not on the termination form and the final recommendation inappropriately relied in part on Rodriguez's past performance to support her termination. It is undisputed that Key approved Rodriguez's termination. As the court of appeals stated, this evidence "does nothing to establish an actual policy deviation."[48] OAG policy does not prohibit a supervisor from factoring an employee's past discipline when recommending termination.

Rodriguez also argues that she introduced evidence that her successor was treated more favorably. Rodriguez's successor similarly struggled to eliminate the office's backlog and meet deadlines, but he was demoted to another position, not fired. Smith and Key approved the demotion. When that happened, however, Duberney was no longer the El Paso regional administrator. "Employees are similarly situated if their circumstances are comparable in all material respects, including similar standards, supervisors, and conduct."[49] Though "similarly situated" employees need not be "identical,"[50] a different regional administrator responsible for the region's priorities and management makes the two not "similarly situated."[51] Because

---

[48] 535 S.W.3d at 77–78 (citing *Arismendiz v. Univ. Tex. El Paso*, 536 F. Supp. 2d 710, 719 (W.D. Tex. 2008)).

[49] *Ysleta Indep. Sch. Dist. v. Monarrez*, 177 S.W.3d 915, 917 (Tex. 2005) (per curiam) (footnotes omitted); *see also Alamo Heights*, 544 S.W.3d at 791.

[50] *Monarrez*, 177 S.W.3d at 917 n.3 (observing that "an employee's conduct need not be identical to that of another for the two to be similarly situated" (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000))); *Hertz Equip. Rental Corp. v. Barousse*, 365 S.W.3d 46, 56 (Tex. App.—Houston [1st Dist.] 2011, pet. denied); *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 260–61 (5th Cir. 2009).

[51] *See Monarrez*, 177 S.W.3d at 917 (footnotes omitted); *see also Alamo Heights*, 544 S.W.3d at 791; *Smith v. Wal-Mart Stores (No. 471)*, 891 F.2d 1177, 1180 (5th Cir. 1990) (per curiam) (holding that for a Title VII claim, the plaintiff's burden "is to show 'that the misconduct for which she was discharged was nearly identical to that

Rodriguez and her successor did not have the same supervisor that recommended disciplinary action, and Rodriguez's supervisor (Duberney) did not know of the Galindo report when she recommended that the agency fire Rodriguez, the comparison with Rodriguez's successor does not raise an inference of retaliatory motive.

*     *     *

We hold that the evidence establishes that Rodriguez was fired based on conduct unrelated to her protected activity, and no evidence demonstrates that activity was a but-for cause of the termination of her employment. Accordingly, we reverse and render judgment that Rodriguez take nothing on her Whistleblower Act claim.

 

 

_____

Jane N. Bland
Justice

OPINION DELIVERED: June 12, 2020

---

engaged in by a male employee whom [the company] retained.'" (alteration in original) (quoting *Davin v. Delta Air Lines, Inc.*, 678 F.2d 567, 570 (5th Cir. Unit B 1982))).