**Reversed and Rendered and Opinion filed March 9, 2021.**



In The

# Fourteenth Court of Appeals

### NO. 14-19-00740-CV

## GATOR GONE SAFETY PILOTS, Appellant

### V.

## GARRY W. HOLT, Appellee

**On Appeal from the 190th District Court
Harris County, Texas
Trial Court Cause No. 2016-23212**

## O P I N I O N

Appellant Gator Gone Safety Pilots appeals a judgment notwithstanding the verdict following a jury trial. The dispute arises from injuries appellee Garry W. Holt received in an accident during the transportation of an oversized load along Interstate 10. A jury found Gator Gone 15 percent responsible and apportioned the remaining 85 percent responsibility among two other defendants. On Holt's motion, the trial court granted judgment notwithstanding the verdict, disregarded the jury's

negligence findings against all defendants other than Gator Gone, and signed a judgment awarding Holt recovery of all his damages against Gator Gone.

Gator Gone asserts that the judgment is error because legally sufficient evidence supports the jury's findings against all three defendants. In cross-points, Holt urges that, should we find the jury's findings supported by legally sufficient evidence, we must nonetheless not render judgment on the verdict because (1) certain findings lack factually sufficient evidentiary support, and (2) Gator Gone's counsel presented improper jury argument.

For the reasons explained below, we conclude that the trial court erred in granting Holt's motion for judgment notwithstanding the verdict because legally sufficient evidence supports the jury's liability findings against all three defendants. Further, we determine that none of Holt's cross-points would vitiate the jury's verdict. Therefore, we sustain Gator Gone's issues, overrule Holt's cross-points, and reverse and render judgment in accordance with the jury's verdict.

**Background**

Bennett Motor Express, an experienced oversized load trucking company, was hired to transport oversized cargo from the Port of Houston to Corpus Christi. The load was 19 feet wide and 18 feet, 6 inches tall—dimensions necessitating specialized transportation measures and a permit from the Texas Department of Transportation ("TxDOT"). Bennett assigned Steven Jones to drive the truck carrying the load. Employed by Bennett since 2004, Jones had years of experience transporting oversized loads. A photograph of the loaded truck was introduced into evidence, and we reproduce it here:

2



DEFENDANT'S EXHIBIT

7 - A

According to Jones, Bennett was responsible for delivering the cargo safely to its destination. To assist with the job, Bennett hired a team consisting of three police motorcycle escorts, a "pilot" car company (Gator Gone), and a "bucket" truck company (VersaBucket LLC). The pilot car's purpose was to drive in front of the load truck with a long, fiberglass pole attached to the front of the car and extending straight up to a height exceeding the load's height. The pole "telescopes," meaning it retracts and extends, and it can be tightened by turning screws. If the pole touched an overhead obstruction, such as a cable or tree, the pilot car driver was to alert the team so that the bucket truck—following directly behind the pilot car—could raise the obstruction enabling the load truck to pass under it without incident. A rear

3

escort car followed just behind the load truck to alert other drivers to the load and watch for contact with the load when the truck passed under obstructions. As Jones said, it is Bennett's responsibility to verify that the people it hires for the team are trained and qualified.

Gator Gone provided the pilot car, driven by Heidi LeClair, and the rear escort car, driven by Pamela Davidson. LeClair and Davidson are certified and experienced drivers. VersaBucket employees Lawrence Alanis and Hermino Cervantes operated the bucket truck. VersaBucket was a new company, and Alanis and Cervantes had received two or three months of on-the-job training before this trip, but no formal instruction. Neither Alanis nor Cervantes were certified drivers. This trip was VersaBucket's second job.

The transport would take several days, and Jones, being "in charge" of the team, led a pre-trip meeting among team members before leaving the port. One of Jones's responsibilities was to determine the height of the pilot car's pole. To do this, Jones had to account for everything that would establish the highest point of the load, which was essentially a "big box" and included six-inch lifting "lugs" or "hooks" protruding from the top. Jones determined that the load height, including the lifting hooks, was 18 feet, 6 inches. He instructed LeClair to set the pole's height at 19 feet, which she did. Jones personally verified that the pole was in fact 19 feet high before the trip began.

The load's height mandated an additional protective measure the parties refer to as "stripping." Stripping consists of one or more rows of wood or plastic pipe secured on top of the load from front to back. Here, two rows of one-and-a-half-inch PVC pipe was used. The ends of the PVC pipe extended at an arch a few feet over the front edge of the load and were tied with a rope or cord to the trailer. We reproduce here a photograph of the stripping's front end introduced into evidence:

4



The purpose of stripping, Jones explained, is to allow an overhead obstruction like a cable to glide over the top of the load so it does not catch on anything. VersaBucket installed the stripping on this load with Jones's agreement on how it was to be done. In particular, the stripping's high point was supposed to align with the top of the lifting hooks and be secured with wiring and tape. Correct installation of stripping is important because if the stripping slipped off or became unattached to the highest point of the lifting hook, then something like a cable could snag on the hook. Alanis had never installed stripping before beginning work with VersaBucket three months before this job. On prior jobs, Jones often inspected the stripping before beginning the transport; but, importantly, he did not remember whether he inspected the stripping on this job before they left the port.

5

During the trip's first hour, the pilot car encountered some obstructions that required raising by VersaBucket. The truck drove under them without incident. Although the pole can slip or retract when it hits obstructions because the screws might vibrate and loosen on impact, no one noticed any issue with the pole slipping or needing adjustment after they encountered the early obstructions. Because LeClair observed pole slippage on prior trips, she carefully watched the pole through a special mirror on her dashboard.

A little over an hour into the trip, the team approached an intersection on an access road adjacent to I-10. Several cables hung over the road; the lowest was a communication or data line, suspended underneath four power lines. According to an expert, the data line's height was 16 feet, 6 inches at its lowest point, and 18 feet, 3 inches at its highest. Though the pilot car's pole height was believed to be 19 feet, the pilot car drove under the data line first, and LeClair announced that the pole cleared the line without touching. Alanis and the lead police officer saw the pilot car drive through the intersection without the pole touching the line.[1] The bucket truck followed through the intersection, also without touching the data line. If the pilot car does not hit an overhead obstruction, that indicates to Jones that his load will not hit it either. The police officer signaled Jones to proceed. As the load was about halfway under the data line, Davidson, who was watching from the rear escort car, saw the line becoming taut. It appeared to her like the line was caught on something on top of the load. Although she could not see the top of the load, the side was visible and she saw the line being pulled. The line snapped, dropping to the access road and "bouncing around." Jones thought he saw sparks "a ways down" and stopped. A power line broke and fell to the main lanes of I-10, where it struck

---

[1] It was Alanis's practice to watch the pilot car as it drove under an obstruction to watch for contact.

an eighteen-wheel vehicle driven by Holt. Holt suffered arm, wrist, and elbow injuries, requiring surgery.

Jones agreed it was fair to question whether the pole height was 19 feet when LeClair drove under the data line. According to LeClair, nothing had occurred during the trip's first hour that caused her to think the pole's height had slipped, but no one re-measured the pole during that hour. LeClair also believed that she drove her car underneath the lowest part of the line, as a pilot car driver is supposed to do. On prior jobs, LeClair said, the bucket truck would identify the lowest point for her, but VersaBucket did not do that on this trip. The wire hung at an angle, and the road may have had a pitch. LeClair also said that the load was rocking side-to-side a little, but not unusually so, and the wind was blowing.

After the accident, all the vehicles pulled into the parking lot of a nearby truck stop. One of the police escort officers told the team not to touch anything. Two people, however, may have disregarded that instruction. Cervantes said he saw LeClair remove the pole from her car and adjust it to "scoot it up." LeClair denied adjusting or measuring the pole at any time while they waited in the parking lot. Additionally, Davidson testified that she saw one of the VersaBucket employees on top of the load repairing or moving the stripping. Alanis also said that Cervantes checked the stripping at the truck stop, but he did not recall whether he made repairs. Cervantes did not remember if he checked the stripping at the truck stop, but he knew that additions were made after the accident. Davidson agreed, recalling that before resuming the trip the following day, she noticed three rows of stripping across the top of the load instead of only two.

When CenterPoint personnel tasked with investigating the incident arrived at the truck stop about thirty minutes later, they measured the pole and found it be 19 feet. CenterPoint issued a written warning to Jones. The investigating police officer

issued no tickets and told LeClair that "it was probably the wind and the lean of the load" that caused the accident.

Following the accident, LeClair bought clamps and attached them to the pole, but the witnesses generally agreed that at least some height slippage occurred during the remainder of the trip. Cervantes, for example, saw the pole slip several times. According to LeClair, on prior trips the bucket car would measure the pole throughout the day, but VersaBucket did not do that here. She said she checked the pole height throughout the remaining days of the trip because VersaBucket did not. Bennett also had the right to check the pole height at any time.

Holt brought negligence and gross negligence claims against numerous defendants, including Bennett, Gator Gone, VersaBucket, CenterPoint, and Sapphire Rose Pilot Car, Inc., the company that dispatched Gator Gone. Before trial, Holt non-suited his claims against CenterPoint. He also settled his claims against Bennett and VersaBucket for $62,500 and $20,000, respectively.[2] During trial, the court directed a verdict in Sapphire Rose's favor, and Holt non-suited his gross negligence claims against all defendants.

The court submitted to the jury negligence and proportionate responsibility questions as to Gator Gone, Bennett, and VersaBucket. Question no. 1 asked whether the negligence, if any, of Gator Gone, Bennett, or VersaBucket proximately caused the occurrence. The court defined "negligence,"[3] "ordinary care,"[4] and

---

[2] Holt non-suited his claims against Bennett and VersaBucket after trial.

[3] "Negligence" meant: "failure to use ordinary care, that is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances." *See* State Bar of Tex., *Tex. Pattern Jury Charges–General Negligence* PJC 2.1 (2018).

[4] "Ordinary care" meant: "that degree of care that would be used by a person of ordinary prudence under the same or similar circumstances." *See id*.

"proximate cause."[5]   The jury found that the negligence of all three defendants proximately caused the occurrence and assessed 70 percent responsibility to Bennett and 15 percent each to Gator Gone and VersaBucket.   The jury awarded Holt damages of $963,540.60.

Holt moved for a judgment notwithstanding the verdict ("JNOV"), in part, asking the court to disregard the jury's liability findings as to Bennett and VersaBucket.  Holt argued that he conclusively proved Gator Gone's negligence was the sole proximate cause of the incident.   Additionally, Holt contended that no legally or factually sufficient evidence supported the negligence findings against Bennett and VersaBucket; that neither Bennett nor VersaBucket breached any legal duties; that Gator Gone's counsel engaged in "innuendo and misrepresentations" during closing argument that created a false impression that Bennett owed a duty it did not owe; and that LeClair "lied under oath."   After a hearing, the trial court granted Holt's JNOV motion and signed a final judgment against Gator Gone only, awarding Holt $1,016,150.86 in damages and interest.

Gator Gone appeals.

## Issues Presented

Gator Gone raises eight issues, but the first seven can be distilled to a single theme:  the trial court erred in granting the JNOV motion because sufficient evidence supports the jury's liability findings against all three defendants.   In its eighth issue, Gator Gone urges us to render judgment in accordance with the jury verdict, rather

---

[5] "Proximate cause" meant:   "that cause, which in a natural and continuous sequence, produces an event, and without which cause such event would not have occurred.  In order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event."  This proximate cause definition is based on a former version of the Pattern Jury Charges.  *See* State Bar of Tex., *Tex. Pattern Jury Charges–General Negligence* PJC 2.4 (2008).

than remand the case.

When a trial court grants a JNOV motion, our appellate rules require an appellee to raise by cross-point "any issue or point that would have vitiated the verdict or that would have prevented an affirmance of the judgment if the trial court had rendered judgment on the verdict." Tex. R. App. P. 38.2(b)(1). Holt has raised cross-points. He argues that the jury's liability findings against Bennett and VersaBucket lack legally and factually sufficient evidentiary support. He contends further that judgment on the jury findings is not permitted because Gator Gone presented incurably harmful jury argument during closing.

**Analysis**

**A. Standard of review**

We review a trial court's grant of a judgment notwithstanding the verdict under a no-evidence standard, examining whether any evidence supports the jury's findings. *Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 347 (Tex. 2015); *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 227 (Tex. 1990). No evidence exists when there is:

> (a) a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; (d) the evidence establishes conclusively the opposite of the vital fact.

*City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). More than a scintilla of evidence exists when the evidence supporting the finding "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995) (citation omitted). When determining whether any evidence supports a judgment, we are "'limited to reviewing only the evidence tending to support the jury's verdict and must disregard

10

all evidence to the contrary.'" *Gharda USA, Inc.*, 464 S.W.3d at 347 (quoting *Mancorp, Inc.*, 802 S.W.2d at 227). We credit evidence supporting the verdict if reasonable jurors could, and disregard evidence contrary to the verdict unless reasonable jurors could not. *City of Keller*, 168 S.W.3d at 823, 827. Thus, we view the evidence and possible inferences in the light most favorable to the verdict. *Gharda USA, Inc.*, 464 S.W.3d at 347. If more than a scintilla of evidence supports the verdict, we must uphold it. *See Bank of Am., N.A. v. Eisenhauer*, 474 S.W.3d 264, 265 (Tex. 2015) (per curiam); *Viajes Gerpa S.A. v. Fazeli*, 522 S.W.3d 524, 530 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). Of course, the final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009) (citing *City of Keller*, 168 S.W.3d at 827); *see also Viajes Gerpa*, 522 S.W.3d at 530.

We also must bear in mind that it is the jury's sole province to evaluate witness credibility and to determine the weight, if any, afforded testimony. *Envtl. Procedures, Inc. v. Guidry*, 282 S.W.3d 602, 626 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) (citing *City of Keller*, 168 S.W.3d at 819).

## B. Legal sufficiency discussion

The first question we address is whether legally sufficient evidence supports the jury's findings against all three defendants. The trial court instructed the jury consistent with a broad form ordinary negligence theory. To prevail on a common law negligence claim, a claimant must prove: (1) a legal duty owed by one person to another; (2) a breach of that duty; and (3) damage proximately caused by the breach. *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004); *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995).

The threshold inquiry in a negligence case is duty. *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995). "The existence of a duty is a question of law for the court to decide based on the specific facts of the case." *Kukis v. Newman*, 123 S.W.3d 636, 639 (Tex. App.—Houston [14th Dist.] 2003, no pet.). When a trial court submits a negligence question to the jury, the court has implicitly concluded that a duty exists. *Id*. Holt challenges the duty element as to Bennett and VersaBucket, and our review of that issue is de novo.[6] *See Rice v. Rice*, 533 S.W.3d 58, 60 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

Next, we will consider whether legally sufficient evidence supports the breach and proximate cause elements as to any party who owes a duty. All agree here that legally sufficient evidence supports the jury's findings that Gator Gone breached a duty of ordinary care and that its breach was a proximate cause of the accident. But Holt ardently disputes the jury's breach and causation findings against Bennett and VersaBucket, as well as the jury's apportionment of responsibility among all three defendants. According to Holt, only Gator Gone's negligence proximately caused the accident; hence, a judgment against Gator Gone for 100 percent of Holt's damages is the only legally supportable one.

To establish a breach, the evidence must show that a party's conduct constituted negligence, which is simply doing or failing to do what a person of ordinary prudence in the same or similar circumstances would have not done or done. *See Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 SW.3d 580, 607 (Tex. 2016). Breach of a duty proximately causes an injury if the breach is a cause in fact

---

[6] Though the court submitted the negligence question against all three defendants with no objection by Holt, Holt is not barred from claiming for the first time after verdict that a submission he requested is unsupported by legally or factually sufficient evidence. *See* Tex. R. Civ. P. 279. Holt raised the issue in his JNOV motion, thus affording the trial court an opportunity to address it. Because Holt's no-duty argument presents a pure legal question, it is akin to a legal sufficiency challenge. *See Holland v. Wal-Mart Stores, Inc.*, 1 S.W.3d 91, 94-95 (Tex. 1999).

of the harm and the injury was foreseeable. *Stanfield v. Neubaum*, 494 S.W.3d 90, 97 (Tex. 2016). The jury was instructed consistently with these standards, which we use to measure evidentiary sufficiency. *See Green v. Dallas Cty. Schs.*, 537 S.W.3d 501, 506 (Tex. 2017) (per curiam); *Starkey v. Graves*, 448 S.W.3d 88, 103 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

As the ultimate inquiry is whether the evidence would enable reasonable and fair-minded people to assess responsibility as it did against all three defendants, we consider the evidence relevant to each in the light most favorable to the verdict, beginning with Gator Gone.

1. *Gator Gone*

Both LeClair and Jones testified that the pole's height was set at 19 feet before they left the port. LeClair said she watched the pole carefully and did not see it slip. They were only an hour into the trip when the incident occurred, and LeClair had encountered only a couple of overhead obstructions before that time. After the incident, CenterPoint measured the pole's height and confirmed it was 19 feet. Much of Gator Gone's appellate argument is premised on the notion that the jury likely accepted LeClair's testimony and found that the pole's height never slipped below 19 feet before the accident and that the pole was at 19 feet when LeClair drove under the data line.

The jury, however, heard evidence it reasonably could have credited in finding that LeClair failed to act as a person of ordinary prudence and that her negligence was at least a proximate cause of the accident. Several witnesses offered testimony supporting Holt's theory that the pole was not at 19 feet when LeClair passed under the line. As LeClair herself acknowledged, hitting overhead obstructions could cause the pole to slip, and the pole car in fact encountered other overhead obstructions before reaching this intersection. The jury may have found that the pole

13

slipped from its proper height during the trip's first hour, but that LeClair failed to see or correct it. LeClair was adamant that the pole had not slipped before the accident, but the jury may have disbelieved her based on, for instance, testimony about pole slippage throughout the trip. After the transport resumed the day after the accident, both LeClair and VersaBucket saw the pole slip, which required adjustment, even after LeClair purchased and applied clamps. Though Jones had no criticisms of LeClair, he thought it fair to question whether the pole was at 19 feet when going through the intersection.

Further buttressing Holt's theory, Cervantes testified that he saw LeClair raise the pole's height shortly after the incident and before CenterPoint measured it. No other witness saw LeClair adjust the pole's height—she adamantly denied doing so—but credibility determinations like this one are the jury's to make. *E.g.*, *Merrill v. Sprint Waste Servs.*, 527 S.W.3d 663, 671 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (citing *City of Keller*, 168 S.W.3d at 819-20); *Crum v. Goza*, No. 14-11-00256-CV, 2012 WL 2928579, at *3 (Tex. App.—Houston [14th Dist.] July 19, 2012, no pet.) (mem.op.).

The jury also heard expert testimony that Gator Gone's pole could not have been set at 19 feet when LeClair drove under the line. In 2017, while still a defendant, CenterPoint investigated the incident. Overlaying Google Earth photos of the intersection taken in June 2014 with photos taken after the incident in July 2018, CenterPoint's retained 3-D imaging expert, John Swanson, determined that the data line hung over the intersection at heights ranging from 16 feet, 6 inches to 18 feet, 3 inches. Swanson testified that he was 90 to 95 percent confident that his measurements were correct, plus or minus 2 inches. Another expert, Van Tseng, said that if the pole height had been at 19 feet when LeClair drove under the wire, the pole would have struck the wire.

14

Gator Gone sought to discredit Swanson's evidence. It established, for example, that the pictures on which Swanson relied to create his 3D model were taken in June of 2014 and in July of 2018, while the accident occurred in October 2015—15 months after the first photos were taken and nearly 3 years before the last pictures were taken. Swanson had no reason to believe the height of the line would have been different on the date of the incident, but again the jury determined whether to accept none, some, or all of his testimony. *See Bay Rock Operating Co. v. St. Paul Surplus Lines Ins. Co.*, 298 S.W.3d 216, 229-30 (Tex. App.—San Antonio 2009, pet. denied) (jury may believe all, part, or none of expert's testimony).

Apart from the issue of pole slippage, there was discussion about whether LeClair drove the pole car under the lowest-hanging part of the line. LeClair believed she had done so, but there was evidence that the overhead wires hung at an angle, and the road may have had a pitch. She said that the bucket truck normally directs her to an obstruction's lowest point over a road, but VersaBucket did not do that at this intersection.

Based on the above evidence, the jury could have found that the pole's height was not at 19 feet but had slipped to a height low enough to have allowed LeClair to pass under the line without touching it. It was partly though not exclusively Gator Gone's responsibility to ensure proper pole height throughout the trip, and LeClair said she regularly watched the pole from the driver's seat of her car by using a dashboard mirror. The jury may have believed that LeClair should have realized the pole had slipped and was negligent in failing to do so.[7] The jury also may have

---

[7] In a section of his brief, Holt emphatically castigates LeClair as a "liar" because the overwhelming "physical evidence" shows that her pole must have dropped to below 19 feet when she drove under the line, and her contrary testimony cannot be true. We fail to appreciate Holt's point in this regard, as the jury alone assessed her credibility, and, as we have observed and our decision presumes, the jury may have disbelieved her.

15

found that LeClair did not proceed through the intersection at the ideal location under the line. The jury reasonably could have found that LeClair failed to exercise ordinary care in both respects, which is more than a scintilla of evidence of breach.

The jury also may have determined that, had the pole been at the correct height or had LeClair driven under the lowest part of the line, the pole would have touched the line and VersaBucket could have raised it, thus preventing the accident. Considered along with the expert testimony, this is some evidence that LeClair would not have cleared the intersection if the pole was at the correct height or if she had driven under the line at a different location, which supports the cause-in-fact component of proximate cause.

Foreseeability is shown because Gator Gone's participation as a team member and the use of a pole car is intended to guard against precisely this type of incident. If the pole's height dropped below 19 feet, or if LeClair failed to drive under an obstruction's lowest point, it was foreseeable that the pole car might proceed under a low-hanging obstruction without touching it and thus fail to alert the bucket truck of the need to raise the obstruction and mislead the truck driver into believing that it is clear to proceed. Thus, the evidence is legally sufficient to support the findings that Gator Gone failed to exercise ordinary care and that its failure was at least a proximate cause of the accident.

2. *VersaBucket*

a. Duty

A party owes a duty to use ordinary care in performing tasks it agrees to perform. *See Chapman Custom Homes, Inc. v. Dallas Plumbing Co*., 445 S.W.3d 716, 717-18 (Tex. 2014) ("[T]he negligent performance of a contract that proximately injures a non-contracting party's property or person states a negligence

16

claim[.]") (citing *Coulson v. Lake L.B.J. Mun. Util. Dist.*, 734 S.W.2d 649, 651 (Tex. 1987); and *Montgomery Ward & Co. v. Scharrenbeck*, 204 S.W.2d 508, 510 (Tex. 1947) (observing that common law duty to perform with care and skill accompanies every contract and that the failure to meet this implied standard might provide a basis for recovery in tort, contract, or both under appropriate circumstances)). One who acts may become duty-bound to act carefully. *See Fort Bend Cty. Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 396 (Tex. 1991). Moreover, if a party negligently creates a dangerous situation, the party then has a duty "to do something about it to prevent injury to others if it reasonably appears or should appear to him that others in the exercise of their lawful rights may be injured thereby." *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 837 (Tex. 2000).

Concerning motor vehicles specifically, users of public roads have a duty of ordinary care not to create foreseeable risks of harm to other drivers on the road. *See Hatcher v. Mewbourn*, 457 S.W.2d 151, 152 (Tex. App.—Texarkana 1970, writ ref'd n.r.e.). Generally speaking, drivers have a "duty to exercise the ordinary care a reasonably prudent person would exercise under the same circumstances to avoid a foreseeable risk of harm to others," including a duty to keep a proper lookout. *Ciguero v. Lara*, 455 S.W.3d 744, 748 (Tex. App.—El Paso 2015, no pet.); *see Montes v. Pendergrass*, 61 S.W.3d 505, 509 (Tex. App.—San Antonio 2001, no pet.).

This court and others have held that duties of ordinary care applied to parties who participated in loading and transporting oversized or potentially dangerous equipment or materials. *See Bujnoch v. Nat'l Oilwell Varco, L.P.*, 542 S.W.3d 2, 9-10 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (party loading truck and failing to verify it was secure owed negligence duty notwithstanding that different company owed duty to secure load under federal regulations); *C&H Nationwide,*

*Inc. v. Thompson*, 810 S.W.2d 259, 267 (Tex. App.—Houston [1st Dist.] 1991), *rev'd in part on other grounds*, 903 S.W.2d 315 (Tex. 1994) (defendant who supervised loading of pipe which later fell off moving truck and killed another driver owed duty in ordinary care even though other defendants performed the tasks of loading and securing); *see also United Rentals N. Am., Inc. v. Evans*, 608 S.W.3d 449, 463 (Tex. App.—Dallas 2020, pet. filed) (owner of oversized equipment negligently authorized unsuitable truck to transport equipment, and driver of trucking company failed to verify height of load, which struck bridge and killed motorist). In each of these cases, the courts upheld the existence of a negligence duty owed to innocent third-party motorists under the facts presented.

Holt asserts that VersaBucket had no duty to do anything after LeClair proceeded through the intersection without hitting the overhead line and announced "clear." But some evidence showed that VersaBucket agreed to perform certain tasks and thus had a duty to perform them with ordinary care. In fact, the evidence was undisputed in one critical area: stripping. Jones testified that he relied on VersaBucket to provide and properly install the stripping for this load, and VersaBucket installed the stripping with Jones's consultation. According to Jones, Bennett and VersaBucket agreed that VersaBucket was supposed to secure the stripping "even" with the top of the lifting hooks. The record shows conclusively that VersaBucket agreed to perform, and did perform, the stripping. Holt does not contend otherwise. VersaBucket had a duty to use reasonable care in installing the stripping.

The testimony on the scope of VersaBucket's work was less than clear in other respects. As Holt emphasizes, LeClair admitted that once she clears an intersection, VersaBucket was "not supposed to do anything." But she also said she thought "everybody involved is responsible." In later questioning, LeClair testified that, in

18

her experience, bucket truck operators often undertook additional responsibilities, such as watching the pole height and instructing the pole car driver where to proceed through an intersection to minimize the risk of hitting an overhead obstruction. LeClair said VersaBucket did not perform these tasks in this case, at least before the accident. However, both LeClair and Cervantes testified that, after the accident VersaBucket watched the pole for slippage and adjusted it throughout the trip. Thus, there is some evidence that VersaBucket agreed to perform the task of watching the pole height, and the jury reasonably could have inferred that VersaBucket had agreed to perform that task for the trip's complete duration, including before the accident. VersaBucket therefore had a duty to use reasonable care in performing that task.

We note the jury's consideration of VersaBucket's scope of work was limited to the oral testimony because any written agreement between Bennett and VersaBucket that may have delineated VersaBucket's contractual duties was not introduced for the jury's consideration. In his brief, Holt directs us to copies of VersaBucket's pricing schedule and invoice to Bennett as evidence of their contract. Holt presented these documents to the court as part of the JNOV briefing but did not offer them to the jury. To the extent they may, post-trial, add to the universe of evidence the court may consider in assessing the existence of a duty, we note that they confirm that VersaBucket in fact agreed to perform the stripping because that task is included on the invoice to Bennett. As to whether VersaBucket agreed to watch the pole throughout the trip, neither the invoice nor the pricing schedule contain sufficient information to confirm or refute the oral testimony.

The trial court instructed the jury that VersaBucket owed a general tort duty of ordinary care. The court's question and definitions have a basis in law and in the evidence based on the tasks VersaBucket agreed to perform and did perform. *See Chapman Custom Homes, Inc.*, 445 S.W.3d at 717; *Evans*, 608 S.W.3d at 463;

19

*Bujnoch*, 542 S.W.3d at 9-10; *C&H Nationwide, Inc.*, 810 S.W.2d at 266-67. We reject Holt's arguments to the extent he contends that VersaBucket owed no duty of ordinary care.

### b. Breach and causation

The issue of stripping was covered extensively at trial. Jones agreed that the stripping was "important," although he could not recall if he inspected the stripping VersaBucket installed before leaving the port. The stripping itself consisted of multiple pieces of conduit piping, attached to each other. As Jones said, the stripping is supposed to prevent an overhead obstruction like a cable from catching on protrusions like the lifting hooks.

Davidson, driving the rear escort car, was the first person to notice that the data line had caught on the load. As they approached the intersection, Davidson's car was ten feet behind the load, straddling the "zipper" or painted stripes on the road. She said the load was about halfway under the line when the line contacted something on the top of the load and became taut. She announced on the radio that the line had stuck. The line pulled until it broke then dropped to the feeder road where it "bounced" around. On cross-examination, Davidson acknowledged that she could not actually see on top of the load from her vantage point, but she could see the side of the load where the line was being pulled. Based on her position, she estimated that the line was caught on something midway along the top of the load.

After the accident and while sitting in her car at the truck stop, Davidson saw the bucket truck raised by the load and a VersaBucket employee on top working on the stripping. She said, "they had the pipe, and they looked like they were repairing it or moving it or something like that." She continued, "[o]ne length wasn't enough for the – whole load from start to finish. And so it was – in the center, there was I guess two joints. And they were – when I glanced up, they were doing something.

20

Kind of pushing the pipe together."[8] In her post-accident written statements, LeClair also stated that the "bucket truck fixed poles and tarp" on the date of the incident. Alanis testified that Cervantes checked the stripping after the incident. According to Cervantes, he did not make any repairs to the stripping after the incident, but he acknowledged that "additions" were made to it. At the time of the accident, the load had two rows of stripping; but after the accident, Davidson noticed three rows.

It was the jury's province whether to accept any testimony and inferences a reasonable factfinder could have accepted. *See Merrill*, 527 S.W.3d at 671; *City of Keller*, 168 S.W.3d at 827-28. The jury reasonably could have believed Davidson and inferred that the line caught the lifting hook, and that a VersaBucket employee was on top of the load after the accident adjusting or fixing the stripping because it came loose or was not installed properly to ensure that an overhead obstruction like this data line would not catch on the hook. Holt states in his brief that "all evidence and testimony demonstrated that the stripping remained attached to the highest point," but the jury reasonably might have believed otherwise based on Davidson's testimony. More than a scintilla of evidence supports a finding that VersaBucket breached its duty of ordinary care with respect to the stripping.

Additionally, the jury could have determined, based on LeClair's and Cervantes's testimony, that VersaBucket failed to keep a proper lookout for pole slippage. *See Aguirre v. Vasquez*, 225 S.W.3d 744, 757 (Tex. App.—Houston [14th Dist.] 2007, no pet.). These failures could have contributed to Gator Gone's pilot car clearing the intersection.

Regarding cause-in-fact, more than a scintilla of evidence would support a finding that the line likely would not have caught on the lifting hook if VersaBucket

---

[8] Alanis testified that more than one piece of conduit was used to strip this load.

21

had correctly installed the stripping, or if VersaBucket had seen the pole height slip prior to the accident and taken action to correct it or warn LeClair, thus alerting the team that the line was too low and giving VersaBucket the opportunity to raise it. A jury reasonably could find that these acts or omissions by VersaBucket were causes, which in a natural and continuous sequence, produced an event, and without which the harm would not have occurred.

Moreover, we conclude sufficient evidence shows the nature of the harm was foreseeable. Based on the evidence, a jury reasonably could have found that a person using ordinary care would have foreseen that an overhead line or cable might catch on a protrusion such as the lifting hooks, and ultimately break, as a result of VersaBucket's failure to correctly install stripping. Stripping's purpose is to prevent this type of occurrence. Additionally, it is foreseeable that failing to verify the pole's correct height might reasonably result in an overhead line catching on the load and snapping if in fact the pole height had slipped and consequently failed to detect a line too low for the load to pass under safely. According to Holt, it was not foreseeable to VersaBucket that the pole may have slipped before the accident. To the contrary, it was undisputed that the team encountered more than one obstruction within the trip's first hour. LeClair confirmed that the pole could slip if it hit obstructions. Thus, the jury may have reasonably determined that VersaBucket's failures to properly strip the load or properly assist LeClair in watching the pole height were, separately or together, proximate causes of the accident.

We conclude that the breach and proximate cause findings against VersaBucket are supported by legally sufficient evidence. We sustain Gator Gone's issue as to VersaBucket.

22

3. *Bennett*

   a. Duty

      i. The evidence supports the trial court's instruction that Bennett owed a duty of ordinary care.

Ample evidence established that Bennett agreed to transport the cargo and was "in charge" of the trip. Jones agreed that Bennett obtained the necessary TxDOT permit to transport the oversized load, and, at Holt's request, the trial court admitted the permit as Plaintiff's Exhibit 11. Among other things, the permit placed on Bennett "the responsibility . . . to clear any overhead obstructions or utility lines," and provided that Bennett "accepts all responsibility and liability for all damages resulting from movement of the described load on the state highway system." Jones acknowledged that the permit gave Bennett "the right and the *obligation*" to deliver the cargo safely to its destination. (Emphasis added).

As Jones explained, Bennett hired and assembled the transportation "team" comprised of the police escorts, the bucket truck, and the pilot car company. Jones agreed that Bennett wanted a team that "knows what they're doing" and that ensuring that the team was qualified "rests on the shoulders of Bennett." VersaBucket was not an experienced bucket truck company, and neither Cervantes nor Alanis were experienced or certified bucket truck operators. The importance of stripping was discussed in detail, and it is undisputed that VersaBucket was supposed to install the stripping, with Jones's agreement, "even" with the top of the lifting hooks. Because Jones and Alanis consulted together on how to install the stripping, because Jones usually checks the stripping before departing on a trip, and because Jones acknowledged Bennett was responsible to deliver the load safely, the jury reasonably may have determined that Bennett and VersaBucket shared responsibility for

23

ensuring the stripping was properly installed. *See Evans*, 608 S.W.3d at 463; *Bujnoch*, 542 S.W.3d at 9-10; *C&H Nationwide, Inc.*, 810 S.W.2d at 266-67.

Setting the pole height was Bennett's sole responsibility. Jones instructed Gator Gone to set the pole at 19 feet high, which was six inches higher than the oversize load. Jones verified that the pole height was 19 feet before the trip began.

The trial court instructed the jury that Bennett owed a general tort duty of ordinary care. As with the other defendants, the court's liability question and definitions have a basis in law and in the evidence based on the tasks Bennett agreed to perform and did perform. Bennett had a duty to act as a reasonably prudent person given the reasonably foreseeable risk that an innocent driver, such as Holt, would be injured if an oversized load snapped a live power line. *See Evans*, 608 S.W.3d at 463; *Bujnoch*, 542 S.W.3d at 9-10; *C&H Nationwide, Inc.*, 810 S.W.2d at 266-67; *e.g.*, *Nw. Mall, Inc. v. Lubri-lon Int'l, Inc.*, 681 S.W.2d 797, 802 (Tex. App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.) ("This 'duty' is a duty to act as a reasonable prudent person under the same or similar circumstances, considering the reasonably foreseeable risk or probability of injury to persons situated as the plaintiff.").

ii. We reject Holt's argument that Bennett owed no duty based on Gator's Gone's and VersaBucket's purported status as independent contractors.

According to Holt, the JNOV is correct as to Bennett because Bennett owed no duty. The essence of his argument is that Bennett could not have owed a duty—at least regarding the conduct that likely contributed to the accident—because Bennett relinquished control over the tasks Gator Gone and VersaBucket were hired to perform, and thus Gator Gone and VersaBucket were independent contractors. For this reason, Holt says, it is legally impossible to attribute the other defendants' negligence to Bennett and, further, Bennett owed no duty as a matter of law. No

24

party requested a jury question or instruction regarding Gator Gone's or VersaBucket's status as independent contractors, and the jury made no findings on the issue of control. Such matters are ordinarily fact questions for the jury, *Steele v. Greater Houston Transp. Co.*, No. 14-18-01040-CV, 2020 WL 2832033, at \*4 (Tex. App.—Houston [14th Dist.] May 28, 2020, pet. denied) (mem. op.), but here the jury was not asked to decide them. Acknowledging this fact, Holt says Gator Gone's and VersaBucket's status as independent contractors either is shown conclusively or must be deemed found under Texas Rule of Civil Procedure 279.

Holt is correct that the independent contractor principles he invokes apply in cases of vicarious liability. *See, e.g.*, *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 541-42 (Tex. 2002). He says the relevant inquiries are contained in the Pattern Jury Charges question and instruction applicable in agency relationships for purposes of establishing vicarious liability. State Bar of Tex., *Tex. Pattern Jury Charges–General Negligence* PJC 10.8, 10.10 (2018). But that situation is not presented here. Whether Bennett should be liable for the other defendants' conduct was not, as far as we can tell, a matter on which the parties joined issue at trial, nor was it a contention Holt raised in his live pleading. The jury did not hold Bennett responsible for Gator Gone's or VersaBucket's percentages of responsibility. Rather, the jury found that Bennett was itself negligent in breaching its independent duties, and Gator Gone did not argue that Bennett should be responsible for any negligent conduct other than Bennett's. Holt's reliance on independent contractor law is misplaced.

To the extent independent contractor principles have any potential relevance, they do not negate as a matter of law Bennett's (or VersaBucket's) independent negligence duty owed to innocent third-party motorists. *See Bujnoch*, 542 S.W.3d at 8; *see also Evans*, 608 S.W.3d at 463. Moreover, when as here jury findings are absent, Holt cannot prevail under any iteration of his independent contractor

25

argument unless the evidence shows conclusively that Bennett did not control the details, means, and methods of Gator Gone's or VersaBucket's relevant work. *See Steele*, 2020 WL 2832033, at \*4; *John B. Barbour Trucking Co. v. State*, 758 S.W.2d 684, 688 (Tex. App.—Austin 1988, writ denied). We think the issue is not shown conclusively. Control can be established in two ways: by (1) a contractual right of control or (2) an exercise of actual control. *See Painter v. Amerimex Drilling I, Ltd.*, 561 S.W.3d 125, 141 (Tex. 2018); *Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 606 (Tex. 2002). The record includes no written contracts between Gator Gone or VersaBucket on the one hand and Bennett on the other. Thus, the evidence fails to illuminate whom among the defendants may have retained a contractual right of control over the relevant work. And there exists substantial evidence that Bennett in fact exercised some control over the details, means, and methods of Gator Gone's and VersaBucket's tasks. For example, the permit states that Bennett is responsible for clearing overhead obstructions; Bennett was in charge of the team and directed the pre-trip meeting; Jones controlled and directed LeClair how high to set the pole and verified it was set at the correct height before leaving the port; Jones had the right to check the pole height and make changes at any time; Jones did not require LeClair to use clamps on the pole but could have; Jones agreed with VersaBucket on how the stripping would be installed; Jones often inspects the stripping but did not recall doing so in this case; and, according to Sapphire Rose's representative, "[t]he truck driver has 100 percent control." Neither Jones nor any other witness suggested that the reason Jones may not have checked the stripping was because it was not his responsibility or because VersaBucket was solely responsible for the stripping. There was other evidence suggesting that Gator Gone was an independent contractor, but the evidence was not conclusive either way. Thus, the evidence does not establish as a matter of law that Bennett did not control the details, means, and methods of Gator Gone's and VersaBucket's work.

26

Holt argues alternatively that Gator Gone's and VersaBucket's control over the details, means, and methods of their work must be deemed found under rule 279. *See Gulf States Util. Co. v. Low*, 79 S.W.3d 561, 565 (Tex. 2002). We disagree that rule 279 can support either the findings Holt urges or the trial court's JNOV for more than one reason. First, a trial court is not authorized to make findings of fact pursuant to rule 279 when the omitted issue is an independent ground of recovery and, as is true here, no issues referable to it were submitted to the jury. *See J&C Drilling Co. v. Salaiz*, 866 S.W.2d 632, 635 (Tex. App.—San Antonio 1993, no writ) (quoting *Tribble & Stephens Co. v. Consol. Servs., Inc.*, 744 S.W.2d 945, 951 (Tex. App.— San Antonio 1987, writ denied)). Thus, the ground is waived unless the issue is established conclusively, which, as stated, it is not. *See* Tex. R. Civ. P. 279. Second, Holt did not raise this part of his appellate argument in the JNOV motion, and we are limited to considering the grounds stated in the written motion in determining whether the trial court erred in granting a JNOV. *See Fort Bend Cty. Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 394 (Tex. 1991); *Westergren v. Nat'l Prop. Holdings, L.P.*, 409 S.W.3d 110, 121-22 (Tex. App.—Houston [14th Dist.] 2013), *aff'd in part and rev'd in part on other grounds*, 453 S.W.3d 419 (Tex. 2015) (per curiam).

We therefore conclude that Holt's JNOV motion failed to demonstrate that Bennett owed no legal duty for the reasons articulated in the motion. Because Bennett's lack of control over Gator Gone and VersaBucket in material respects is not shown conclusively in the evidence, Holt's independent contractor argument presents no permissible legal ground to disregard the verdict on the basis that Bennett owed no duty of ordinary care.

b. Breach and causation

The jury reasonably could have determined that Bennett breached its duty of ordinary care in several respects. As discussed, the jury may have found that the

stripping was installed incorrectly. Jones testified that he usually checks the stripping before the start of a trip, but he could not recall doing so in this instance, even though stripping is "important," this was VersaBucket's second job, Alanis had never done stripping before beginning work with VersaBucket in July 2015, and Cervantes had no formal training on stripping. The jury reasonably could have inferred either that Jones did not check it, and that his failure to do so was a breach of Bennett's duty of ordinary care, or that Jones did check it but unreasonably failed to detect a defect. The jury also may have determined that, had Jones checked the stripping before leaving the port, any defect would have been corrected and the line would not have caught on the top of the load. Accordingly, if the jury believed the stripping was not installed correctly, it could have apportioned some responsibility to Bennett in addition to VersaBucket for that omission. The jury reasonably could have found that the line caught on the lifting hook and held Bennett responsible because Bennett was in charge and Jones did not double-check the stripping like he normally does, or otherwise failed to identify and correct defective stripping.

Additionally, the jury could have found that Bennett's decision to set the pole only six inches above the load's maximum height was not reasonable. Jones gave conflicting testimony regarding Bennett's policy in this regard, stating first that the pole was to be at ten inches above load height, and, later, at six inches. Holt asserts that either Jones misspoke or the court reporter misheard him when he said Bennett's policy was to set the pole height at ten inches above the load. Other than Jones's testimony, however, Holt directs us to no other evidence regarding Bennett's policy, and it was the jury's decision to resolve any inconsistency it heard. *Merrill*, 527 S.W.3d at 671. If the jury accepted Jones's testimony that Bennett's policy is to set the pole height ten inches above the load, then it reasonably might have believed Jones's decision to set it at 19 feet was a failure of ordinary care. If the jury did not

28

believe that Gator Gone's pole slipped below 19 feet—or that the pole only slipped slightly below that height—it could have apportioned liability to Bennett for failing to set the pole more than six inches above the maximum load height. This too could have been sufficient to support proximate cause against Bennett.

4. *Conclusion regarding legal sufficiency*

Here, there was evidence from which a rational jury could determine that this load struck the overhead line because Gator Gone allowed its pole to slip from its required 19 feet height, because VersaBucket failed to properly strip this load or failed to assist LeClair in keeping a proper lookout, and because Bennett, which bore overall responsibility for the safe transport of the load, failed to ensure that the stripping was installed properly and the pole was set to the proper height. This evidence supports the jury's determination that each of these defendants' negligence proximately caused the incident. *E.g.*, *Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 SW.3d 404, 404 (Tex. 2009); *cf. Evans*, 608 S.W.3d at 461-63.

We conclude that the evidence, viewed in the light most favorable to the verdict, enabled reasonable, fair-minded jurors to arrive at their verdict. There is not a complete absence of a vital fact for any required element for each defendant; there exists no legal bar preventing us from considering the above evidence on all required elements for each defendant; the evidence on each required element is more than a scintilla for each defendant; and no evidence conclusively establishes the opposite of any required element.

Thus, in today's case, instead of uncontroverted or overwhelming evidence of Gator Gone's sole negligence, our review of the record indicates that the jury was faced with conflicting evidence supporting various determinations of whose negligence proximately caused the incident. Accordingly, the jury, as the sole judge of the credibility of the witnesses and the weight to be given their testimony, was

29

entitled to believe the evidence demonstrating that all three defendants' negligence proximately caused this incident. *E.g.*, *Alexander*, 2018 WL 3385117, at *6.

We thus hold that the trial court erred in disregarding the jury's verdict and granting Holt's JNOV motion. We sustain Gator Gone's issues challenging the trial court's grant of Holt's JNOV motion.

## C. Holt's cross-points

Holt has asserted alternative arguments that potentially would prevent us from ordering rendition of judgment on the verdict. *See* Tex. R. Civ. P.324(c); Tex. R. App. P. 38.2(b). Holt raises a factual insufficiency point and argues that Gator Gone's counsel presented improper jury argument. We turn to those arguments.

### 1. *Holt has adequately raised cross-points.*

Gator Gone contends that Holt has waived by inadequate briefing any cross-point that the proportionate responsibility finding against Gator Gone is unsupported by factually sufficient evidence or is against the great weight and preponderance of the evidence. In his brief, however, Holt cites more than once to Texas Rule of Appellate Procedure 38.2(b) and Texas Rule of Civil Procedure 324(c), in support of his intent to assert cross-points on appeal. His arguments include: (1) "the jury's proportionate responsibility finding lacks sufficient evidentiary support, and was against the overwhelming preponderance of the evidence as a matter of fact;" (2) the jury's proportionate responsibility verdict should be set aside due to improper jury argument by Gator Gone; (3) substantive contentions that Gator Gone's negligence was the sole proximate cause of the accident; and (4) the evidence is factually insufficient to show any negligence by Bennett and VersaBucket.

To the extent Holt's arguments are based on a contention that Bennett and VersaBucket owed no legal duties, we have addressed those issues de novo and

30

rejected them. We have also rejected Holt's argument that Gator Gone's negligence was the sole proximate cause of the accident. But Holt's remaining arguments are reasonably construed to insist that a proportionate responsibility finding against Gator Gone other than 100% is against the great weight and preponderance of the evidence. As well, Holt advances an improper jury argument cross-point. These arguments are of the sort that would, if correct, tend to "vitiate[] the verdict" or prevent an affirmance if the trial court had rendered judgment on the verdict. *See* Tex. R. App. P. 38.2(b)(1). This is sufficient to advance cross-points in an appeal from the grant of a JNOV motion because the substance of Holt's argument would undermine the original verdict. *See Lion Copolymer Holdings, LLC v. Lion Polymers, LLC*, 614 S.W.3d 729, 733 (Tex. 2020) (per curiam); *Dudley Constr. Ltd. v. Act Pipe & Supply, Inc.*, 545 S.W3d 532, 537-38 (Tex. 2018).

  2. *Factually sufficient evidence supports the jury's proportionate liability findings.*

An assertion that the evidence is factually insufficient to support a fact finding means that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the answer should be set aside and a new trial ordered. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). In a factual sufficiency review, appellate courts must examine the evidence that both supports and contradicts the jury's verdict in a neutral light. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (per curiam); *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 406, 406-07 (Tex. 1998). We are not a factfinder in conducting this review. The fact finder is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). We, therefore, defer to the jury's implicit determinations of credibility and the weight to be given to the evidence. *GTE Mobilnet of S. Tex. Ltd. P'ship v. Pascouet*, 61 S.W.3d 599, 615-16 (Tex. App.—Houston [14th Dist.] 2001,

pet. denied). Further, we may not substitute our own judgment for that of the fact finder merely because we might have reached a different result. *Id.*; *see also Thomas v. Uzoka*, 290 S.W.3d 437, 452 (Tex. App.—Houston [14th Dist.] 2009, pet. denied).

Holt has not demonstrated that the jury's negligence findings against Bennett and VersaBucket are against the great weight and preponderance of the evidence. The evidence discussed above regarding the negligence of Gator Gone, VersaBucket, and Bennett also supports the jury's assignment of proportionate responsibility. "The jury is given wide latitude in performing its sworn duty to serve as the fact finder in allocating responsibility." *Pasadena Refining Sys., Inc. v. McCraven*, Nos. 14-10-00837-CV, 14-10-00860-CV, 2012 WL 1693697, at *7-8 (Tex. App.—Houston [14th Dist.] May 15, 2012, pet. dism'd) (mem. op.) (citing Tex. Civ. Prac. & Rem. Code § 33.003; *Rosell v. Cent. W. Motor Stages, Inc.*, 89 S.W.3d 643, 659 (Tex. App.—Dallas 2002, pet. denied)). Thus, "[e]ven if the evidence could support a different percentage allocation, an appellate court may not substitute its judgment for that of the jury." *Id.*; *Jackson v. Williams Bros. Constr. Co.*, 364 S.W.3d 317, 325 (Tex. App.—Houston [1st Dist.] 2011, pet. denied); *Samco Props., Inc. v. Cheatham*, 977 S.W.2d 469, 478 (Tex. App.—Houston [14th Dist.] 1998, pet. denied). Holt has directed us to no instance when an appellate court has reversed a jury's apportionment findings in an ordinary negligence case on factual insufficiency grounds. He has failed to demonstrate that the evidence supporting the jury's assignments of responsibility among the defendants is so weak or the evidence to the contrary is so overwhelming that the answers should be set aside. Thus, we have no basis to disturb the jury's assessment. Accordingly, we overrule Holt's challenge to the factual sufficiency of the evidence to support the jury's assignment of responsibility.

3. *No improper jury argument warrants setting aside the jury's verdict.*

In a section of his brief, Holt asserts that Gator Gone misled the jury during closing argument by relying on the text of the TxDOT permit to create a false impression that Bennett owed a duty that it did not owe. He requests a new trial in his prayer.

Holt's argument on this point amounts to approximately one-half of a page of his brief and includes no citations to authority. We would be within our right to reject the issue as inadequately briefed. *See* Tex. R. App. P. 38.1(i). Addressing the issue in the interest of justice, however, Holt's argument fails to demonstrate an error that would prevent an affirmance if the trial court had rendered judgment on the verdict. *See* Tex. R. App. P. 38.2(b)(1).

As we construe Holt's point, he complains that during closing argument Gator Gone misleadingly emphasized to the jury certain portions of the permit introduced as Plaintiff's Exhibit 11. Specifically, Gator Gone directed the jury's attention to the passages stating that Bennett, the permittee, has "the responsibility . . . to clear any overhead obstructions or utility lines," and "accepts all responsibility and liability for all damages resulting from movement of the described load on the state highway system." Gator Gone's counsel stated:

> [Gator Gone's Counsel]: Now, let's look at the -- the -- the permit. That's Plaintiff's Exhibit 11. This is the permit issued to Bennett. Okay? I'm going to have to walk back around here real quick. And when you look at Exhibit No. 11 and look at the permit that was issued to -- to Bennett. And this is -- I just took some excerpts out of it.
>
> Is it up there?
>
> This is the Texas Overweight Single Trip Permit. It is the responsibility of the permittee, which is Bennett, to clear any overhead obstructions or utility lines. It doesn't say that VersaBucket, it doesn't say Gator Gone, it doesn't say anybody else, it says Bennett. That's the State of Texas, Bennett.

> Then it says, Applicant -- the applicant, which is Bennett, accepts all responsibility and liability for all damages resulting from the movement of the described load on the state highway system.
>
> To get this permit, you have to agree to that. Now, let's get back to when I first started off about the fact --
>
> [Holt's counsel]: Objection. May we approach?
>
> The Court: Yes.

According to Holt, Gator Gone improperly and confusingly quoted from the permit to mislead the jury into believing that Bennett owed the responsibilities stated in the permit.

The standard of review for improper jury argument requires reversal under the following circumstances: (1) there is error in the argument; (2) it was not invited or provoked; (3) the error was preserved by an objection, motion for mistrial, or motion to instruct;[9] (4) the error was not curable by instruction, reprimand by the judge, or proper withdrawal of the statement; and (5) the argument by its nature, degree and extent constituted reversible harmful error. *Melendez v. Exxon Corp.*, 998 S.W.2d 266, 280 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (citing *Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 839 (Tex. 1979)). Incurable jury arguments are rare and occur when comments are so inflammatory or prejudicial that their harmful nature cannot be cured by an instruction to disregard. *See id.*; *Nat'l Union Fire Ins. Co. v. Kwiatkowski*, 915 S.W.2d 662, 664 (Tex. App.—Houston [14th Dist.] 1996, no writ); *see Living Ctrs. of Tex., Inc. v. Peñalver*, 256 S.W.3d 678, 680 (Tex. 2008).

We conclude Holt has not identified any reversible error based on improper argument. Gator Gone's counsel did not quote the permit incorrectly. The court

---

[9] We do not address preservation here because Holt asserts improper jury argument in the context of a cross-point following the grant of a JNOV.

admitted the permit without limitation at Holt's request,[10] so there was no restriction on counsel reading from the exhibit during closing argument, and the jury was free to consider it for all purposes.[11] Additionally, the quoted language was merely cumulative of Jones's testimony, who confirmed that, by the permit, Bennett had the right and the obligation to deliver the cargo safely to its destination. Argument based on evidence in the record is proper and is the purpose of closing argument. *See, e.g.*, *Zurita v. Lombana*, 322 S.W.3d 463, 482-83 (Tex. App.—Houston [14th Dist.] 2010, pet. denied); *Clark v. Bres*, 217 S.W.3d 501, 510 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) ("Trial counsel should be allowed wide latitude in arguing the evidence and the reasonable inferences from the evidence to the jury."); Tex. R. Civ. P. 269(e) ("Counsel shall be required to confine the argument strictly to the evidence and to the arguments of opposing counsel.").

Under these circumstances, we overrule Holt's cross-point concerning allegedly improper jury argument.

## D. Disposition

When we reverse a trial court's judgment disregarding jury findings, we must render judgment in harmony with the jury's verdict, unless the opposing party's cross-points have merit. *See Miller v. Bock Laundry Mach. Co.*, 568 S.W.2d 648, 652 (Tex. 1977) (citing *Jackson v. Ewton*, 411 S.W.2d 715 (Tex. 1967)); *Randall v. Walker*, No. 03-15-00317-CV, 2017 WL 1404727, at *6 (Tex. App.—Austin Apr. 13, 2017, no pet.) (mem. op.); *Sw. Galvanizing, Inc. v. Eagle Fabricators, Inc.*, 383 S.W.3d 677, 681 (Tex. App.—Houston [14th Dist.] 2012, no pet). We conclude none of Holt's cross-points is meritorious. Additionally, Holt has not raised a cross-

---

[10] *See* Tex. R. Evid. 105.

[11] Holt claims that the trial court disallowed Gator Gone's use of at least one sentence, but we see no ruling to that effect on the record.

point requiring an evidentiary hearing, thus a remand for that reason is unnecessary. *See* Tex. R. App. P. 38.2(b)(2). Thus, we render the judgment the trial court should have rendered. Because Gator Gone's percentage of liability to Holt did not exceed 50 percent, it is not jointly and severally liable for all of Holt's damages. *See* Tex. Civ. Prac. & Rem. Code § 33.013(b)(1). Under that section, a severally-liable defendant's monetary liability is calculated by multiplying the damages found by the trier of fact by the defendant's percentage of responsibility. *Id.* § 33.013(a); *Roberts v. Williamson*, 111 S.W.3d 113, 123 (Tex. 2003). The jury having found Gator Gone 15 percent responsible, it is liable for 15 percent of Holt's total damages, or $144,531.09. No further credit for the settlement is required. *Roberts*, 111 S.W.3d at 123.

## Conclusion

We hold that the trial court erred in granting Holt's JNOV motion. Accordingly, we reverse the trial court's judgment and render judgment in accordance with the jury's verdict that Holt recover from Gator Gone $144,531.09, plus taxable court costs and pre-judgment and post-judgment interest provided by law.


/s/     Kevin Jewell
        Justice


Panel consists of Chief Justice Christopher and Justices Jewell and Zimmerer.